IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LARRY MORSE and THEODORE RAY BUCK, JR. <br><br>Plaintiffs, <br><br>v. <br><br>KWAME RAOUL in his Official Capacity as the Attorney General of Illinois; THEODORE HAMPSON in his Official Capacity as the State Attorney for Williamson County, Illinois; and SEAN FEATHERSTUN in his Official Capacity as State Attorney for Jefferson County, Illinois <br><br>Defendants. | Civil Action No. 22-cv-2740-DWD |

**VERIFIED SECOND AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

COME NOW the Plaintiffs Larry Morse and Theodore Ray Buck, Jr. ("Plaintiffs"), by and through their undersigned counsel, and complain of the Defendants as follows:

## I.    PARTIES

1. Plaintiff Theodore Ray Buck, Jr. is a natural person and a citizen of the United States and of the State of Illinois and resides in Jefferson County, Illinois.

2. Plaintiff Larry Morse is a natural person and a citizen of the United States and of the State of Illinois and resides in Williamson County, Illinois.

3. Defendant Kwame Raoul is sued in his official capacity as the Attorney General of Illinois. As Attorney General, he is responsible for enforcing the State's laws, *see* 15 I:CS 205/4 (requiring that Attorney General "institute and prosecute all actions and proceedings in favor of or

for the use of the State, which may be necessary in the execution of the duties of any State officer"), which include the State's suppressor ban.

4. Defendant Theodore Hampson is sued in his official capacity as State's Attorney for Williamson County, Illinois. As State's Attorney, he has a duty "[t]o commence and prosecute all actions, suits, indictments and prosecutions, civil and criminal, in the circuit court for his county, in which the people of the State or county may be concerned," including violations of the suppressor ban. Defendant Hampson's ongoing enforcement of the ban against Williamson County residents places Plaintiff Morse under imminent threat of arrest and prosecution should he violate the suppressor ban.

5. Defendant Sean Featherstun is sued in his official capacity as State's Attorney for Jefferson County, Illinois. As State's Attorney, he has a duty "[t]o commence and prosecute all actions, suits, indictments and prosecutions, civil and criminal, in the circuit court for his county, in which the people of the State or county may be concerned," including violations of the suppressor ban. Defendant Featherstun's ongoing enforcement of the suppressor ban against Jefferson County residents places Plaintiff Buck under imminent threat of arrest and prosecution should he violate the suppressor ban.

## II.     JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 and § 1988.

7. Venue lies in this Court pursuant to 28 U.S.C. § 1391.

## III.     STATEMENT OF FACTS

a. **The Second Amendment**

8. The Second Amendment to the United States Constitution provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

9. The Second Amendment guarantees individuals a fundamental right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation.

10. Arms are "'weapons of offence, or armour of defence.' 1 Dictionary of the English Language 107 (4th ed.)" They are anything that a man [or woman] wears for his defense, or takes into his hands, or uses in wrath to cast at or strike another.' 1 A New and Complete Law Dictionary (1771)."

11. The Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding, <u>and covers modern instruments that facilitate armed self-defense.</u>

12. Under the Second Amendment, the Defendants retain the ability presumptively to regulate the manner of carrying arms and may prohibit certain arms in narrowly defined sensitive places, prohibit the carrying of arms that are not within the scope of Second Amendment's protection such as "dangerous and unusual" arms, and disqualify specific, particularly dangerous individuals from carrying arms.

13. The phrase dangerous and unusual weapons historically refers to time, place and manner restrictions on arms.

14. <u>A</u> suppressor is not dangerous and unusual and the mere ownership of a suppressor does not implicate the tradition of prohibiting the carrying of dangerous and unusual weapons.

15. Defendants may not completely ban the keeping and bearing of arms for self-defense that are typically possessed for lawful purposes, deny individuals the right to carry arms

in non-sensitive places, deprive individuals of the right to keep or carry arms in an arbitrary and capricious manner, or impose regulations on the right to keep and carry arms that are inconsistent with the Second Amendment.

### b. Suppressors

16. Suppressors are "firearms" within the context of the Second Amendment, and thus receive Second Amendment protection. As such, an outright ban on the possession of a suppressor violates the Second Amendment.

17. Suppressors are regulated under the National Firearms Act ("NFA") and defined as a "firearm." *See* 26 U.S.C. § 5845(7). The Gun Control Act ("GCA"), 18 U.S.C. § 921(a)(3), also independently defines silencer (which is commonly referred to as a suppressor) as a "firearm." It defines "firearm" as:

> (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

18. Individuals who wish to purchase suppressors or other NFA regulated items are required by federal law to file an application with the Bureau of Alcohol, Tobacco, Firearms and Explosives, who will then approve or deny the application for transfer of the NFA item. *See* 26 U.S.C. § 5812.

19. Suppressors are arms in common use for self-defense by civilians as well as by law enforcement.

20. Suppressors are legal for ordinary individuals to own, possess, and use for lawful purposes, including self-defense, hunting, and target practice, in a supermajority of states (42).

21.     Likewise, there are no historical analogues banning suppressors, and suppressors were not regulated at the federal level until the enactment of the National Firearms Act, which did not ban them, but instead subjected them to a tax, background, and registration scheme.

22.     In 1803, Meriwether Lewis, of Lewis and Clark fame, carried an air gun, reputed to fire 22 rounds per minute, and 40 rounds from one "load" of compressed air, so noticeably quieter than the powder fueled contemporaries, that an air gun was used in an original Sherlock Holmes book as a plot device due to its relatively quiet operation.

23.     In the same way that magazines are arms, so are suppressors.

24.     The "Arms" the people have the right to keep and bear are not strictly limited to firearms but included "ordinary military equipment" such as ammunition, bayonets and iron ramrods fitted on the firearm's barrel, and other "proper accoutrements." Although modern suppressors of the sort at issue here were invented long after the Second Amendment was ratified, the Second Amendment presumptively protects them.

25.     As of 2020,[1] there were 2,042,719 suppressors owned by law abiding citizens as registered in the National Firearms Registration and Transfer Record ("NFRTR"), far more than is needed to find common use.  And that is despite legal impediments to owning a silencer, including the National Firearms Act requirements—paying a $200 transfer tax, submitting a detailed application and fingerprints, and a multi months-long wait for the federal government to process the application. *See* 26 U.S.C. § 5811. Even arms that are far less common have been found to be protected.

26.     Suppressors are also typically used for lawful purposes and are "very rarely used in criminal shootings."   Suppressors do not completely silence firearms or enable criminals using

---

[1] There are likely a much larger number, however, recent statistics are not available.

firearms to go undetected when they would otherwise be heard. See Nathan Rott, Debate Over Silencers: Hearing Protection or Public Safety Threat?, http://www.npr.org/2017/03/21/520953793/debate-over-silencers-hearing-protection-or-public-safety-threat (comparing the sound of four different firearms with and without a silencer); see also, David Kopel, The Hearing Protection Act and 'silencers', Washington Post, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2017/06/19/the-hearing-protection-act-and-silencers/.

27. And the primary purpose of suppressors are for lawful purposes, including hunting, which is part of the Second Amendment right, self-defense, and target shooting which are protected Second Amendment conduct. The right to self-defense has a corresponding right to acquire and maintain proficiency with common weapons.

28. A right to bear those weapons wouldn't mean much without the training and practice that make them effective.

29. Alternatively, suppressors are protected by the Second Amendment because they are protected firearm accessories.

30. The Second Amendment secures the people a right not only to arms but also to accessories and proper accoutrements.

31. Suppressors are protected by the Second Amendment for the same reasons that ammunition and magazines are protected.

32. For the reasons provided, whether viewed as arms or accessories, suppressors are protected by the Second Amendment because they are in common use for lawful purposes.

33. Hearing loss is a risk when training at a range due to the noise emitted by gunfire.

34. The American Speech-Language Hearing Association warns that "[e]xposure to noise greater than 140 dB can permanently damage hearing," and that "[a]lmost all firearms create noise that is over the 140-dB level." Michael Stewart, Recreational Firearm Noise Exposure, http://www.asha.org/public/hearing/Recreational-Firearm-Noise-Exposure/. As a result, people "can suffer a severe hearing loss with as little as one shot, if the conditions are right." *Id*. Other experts agree. Jay M. Bhatt, et al., Epidemiology of Firearm and Other Noise Exposures in the United States, The Laryngoscope at 5, available at http://onlinelibrary.wiley.com/doi/10.1002/lary.26540/epdf.

35. Hearing loss from even limited firearm use is a regular occurrence, "especially during hunting season when hunters and bystanders may be exposed to rapid fire from big-bore rifles, shotguns, or pistols." Stewart, Recreational Firearm Noise Exposure. Even a ".22-caliber rifle can produce noise around 140 dB, while big-bore rifles and pistols can produce sound over 175 dB." *Id*. And firing guns at an indoor firing range, "where sounds can reverberate, or bounce off walls and other structures, can make noises louder and increase the risk of hearing loss." *Id*.

36. Earplugs can be uncomfortable. It is reported that twenty percent of firearms users never use hearing protection. Bhatt, at 5. And "[h]unters are even less likely to wear hearing protection because they say they cannot hear approaching game or other noises." Stewart, Recreational Firearm Noise Exposure.

37. Suppressors offer valuable benefits related to self-defense. Suppressors improve accuracy by reducing recoil and also reduce hearing loss and disorientation after firing, which could give a victim critical additional time to defend against an attack. During a self-defense situation, firing a firearm inside a home can deafen the shooter. A suppressor allows for a homeowner to maintain his or her senses (and his or her hearing) while defending him- or herself.

38. There is a universal understanding that "'[e]xposure to noise greater than 140 dB [decibels] can permanently damage hearing,' according to Dr. Michael Stewart, Professor of Audiology at Central Michigan University. 'Almost all firearms create noise that is over the 140-dB level.'" Stephen P. Halbrook, Firearm Sound Moderators: Issues of Criminalization and the Second. Amendment, 46 Cumb. L. Rev. 33 (2015) at *1. "The National Institute for Occupational Safety and Health recommends that "hunters and shooters use double hearing protection every time a weapon is fired. Double protection involves wearing both earplugs and earmuffs." *Id*.

39. But even the use of a single device makes it hard for a hunter to hear wildlife, and may inhibit one's ability to hear range commands, which can cause accidents." *Id* at *2. "A Finnish study on use of suppressors at rifle ranges showed that "[a]ll rifle suppressors reduced the shooter's exposure from the original 160 ± 3 decibels to below the EU risk limit 140 dB," and that "[i]f noise level decreases by 6 dB, distance to the neighbor can be halved."" *Id*. at *3 f.n, 17.

40. Suppressors are owned both here and all around the world for self-defense, hunting and target shooting. *See Id*. at *44-*46 (listing the legality of suppressors use in many European countries). Here, all suppressors possessed under the NFA are for lawful use by law abiding citizens.

41. In order to own a suppressor under the NFA, one has to register with the government, obtain permission of law enforcement, submit fingerprints, and pay a $200 tax.

42. Target practice is why the first suppressor was designed. "The Maxim Silencer was developed to meet my personal desire to enjoy target practice without creating a disturbance," wrote Hiram Percy Maxim, inventor of the first successful firearm noise suppressor. *Id*. Given the number of states that allow civilian ownership of suppressors and that allow for hunting while using suppressors, it "indicates a broad recognition of legitimate uses of suppressors not only to

protect one's hearing, but also for such purposes as reduction of loud noise that may disturb others or spook game." *Id* at *3. (Footnotes omitted). "'The situations where a group of hunted animals react by fleeing to the sound of a firearm being discharged is so universal to be axiomatic.'" *Id* at *3 fn 18.

43. Suppressors assist in this protected activity by reducing the decibels emitted by a firearm down to levels which do not hurt the ear. Similarly, suppressors assist in hunting by protecting hearing and by dampening the report of a firearm so that game are not scared away. These are the primary purposes of suppressors; therefore their typical use is for lawful purposes and they receive Second Amendment protection.

44. In 2017, Ronald Turk, the Associate Deputy Director (Chief Operating Officer) of the ATF drafted a white paper that discussed various firearms-related issues.[2]

45. Mr. Turk's white paper discussed suppressors specifically, stating that "[i]n the past several years, opinions about silencers have changed across the United States. Their use to reduce noise at shooting ranges and applications within the sporting and hunting industry are now well recognized." *Id*. at 6.

46. Mr. Turk further stated that "silencers are very rarely used in criminal shootings. Given the lack of criminality associated with silencers, it is reasonable to conclude that they should not be viewed as a threat to public safety necessitating NFA classification, and should be considered for reclassification under the [Gun Control Act]." *Id*.

   c. **State of Illinois Law.**

47. Illinois bans "a device or attachment of any kind designed, used or intended for use in silencing the report of any firearm[.]" *See* 720 ILCS 5/24-1(a)(6).

---

[2] https://s3.documentcloud.org/documents/3454608/Read-the-white-paper-on-firearms-regulations.pdf.

48. As such, Illinois has a complete ban on the purchase, possession, hunting, self-defense usage, or any other type of usage of a suppressor in Illinois for an average, law-abiding Illinois citizen. Illinois' ban on suppressors lacks a plainly legitimate sweep.

49. Illinois actively enforces this ban.

50. Possession of a suppressor in Illinois is a felony. "[A] person convicted of a violation of subsection 24-1(a)(6) or 24-1(a)(7)(ii) or (iii) commits a Class 3 felony." 720 Ill. Comp. Stat. Ann. 5/24-1 (LexisNexis, Lexis Advance through P.A. 102-1102, of the 2022 Regular Session of the 102nd Legislature).

### d. Plaintiff Theodore Ray Buck, Jr.

51. Plaintiff Theodore Ray Buck, Jr. ("Buck") desires to purchase a suppressor for self-defense and other lawful purposes in the state of Illinois.

52. Plaintiff Buck has a Federal Firearm License ("FFL") in Illinois and is not a prohibited person. If Illinois allowed him to purchase and own a suppressor, he would apply to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") for permission to own a suppressor, including paying the $200 transfer tax and subjecting himself to an invasive and lengthy background process.

53. But for Illinois law, Plaintiff Buck would be legally allowed to own a suppressor under federal law. Therefore, his desire to own a suppressor is redressable by this Court.

54. But because Illinois bans suppressors for Buck to own and possess, he cannot apply for one, as the ATF cannot, by law, approve his transfer if it would place him in violation of any other law. *See* 26 U.S.C. § 5812(a) ("Applications shall be denied if the transfer, receipt, or possession of the firearm would place the transferee in violation of law."). As such, it is futile for him to even apply to the ATF.

55. But for Illinois law banning suppressors for citizens like him, he would purchase and possess a suppressor and use it for all lawful purposes, including shooting suppressed firearms at the target range because unsuppressed firearms are very loud.

56. In fact, Plaintiff Buck lives in the County and has used his land during target practice. Plaintiff Buck has been visited by the police for target shooting on his property, solely due to the noise from his target shooting. If he were able, Buck would target shoot with suppressed firearms, thus reducing the noise associated with target shooting on his own land and would not have to be weary of police showing up at his land due to noise complaints from neighbors.

57. Plaintiff Buck would also keep a suppressed firearm in his home, so that if he were ever required to use it indoors, he would not damage his hearing and would likely not have enough time to put ear protection on before he would have to use his firearm in self-defense at home.

58. But for Illinois' law, Plaintiff Buck would acquire and possess and use suppressors. *See* Verification of Buck, Exhibit "1."

    **e. Plaintiff Larry Morse.**

59. Plaintiff Larry Morse ("Morse") desires to purchase a suppressor for self-defense and other lawful purposes in the state of Illinois. Plaintiff Morse is an honorably discharged Army veteran.

60. Morse has suffered hearing loss from his time in the Army, as when he served in the late 1960's, he was not always given proper hearing protection.

61. Due to his hearing loss, he intends to preserve the remainder of his hearing by doing all things possible to reduce the impact on his hearing from shooting firearms. As such, Morse wanted to purchase a suppressor, but Illinois makes it illegal to possess a suppressor for him.

62. Morse is also a firearms instructor and being able to shoot suppressed firearms during training would assist him in his training classes as it reduces the noise from shooting firearms.

63. Plaintiff Morse is not a prohibited person, and if Illinois allowed him to purchase and own a suppressor, he would apply to the ATF for permission to own a suppressor, including paying the $200 transfer tax and subjecting himself to an invasive and lengthy background process.

64. But for Illinois law, Plaintiff Morse would be legally allowed to own a suppressor under federal law. Therefore, his desire to own a suppressor is redressable by this Court.

65. But because Illinois bans suppressors for Morse to own and possess, he cannot apply for one, as the ATF cannot, by law, approve his transfer if it would place him in violation of any other law. *See* 26 U.S.C. § 5812(a) ("Applications shall be denied if the transfer, receipt, or possession of the firearm would place the transferee in violation of law."). As such, it is futile for Morse to even apply to ATF for a transfer of a suppressor.

66. Plaintiff Morse also wants to keep a suppressed firearm in his home, so that if he were ever required to use it indoors, he would not further damage his hearing and as he would likely not have enough time to put ear protection on before he would have to use his firearm in self-defense at home.

67. But for Illinois' law, Plaintiff Morse would acquire and possess and use suppressors. *See* Verification of Morse, Exhibit "2."

## COUNT I

### U.S. CONST., AMEND. II, 42 U.S.C. § 1983 AGAINST ALL DEFENDANTS

68. The Defendants prohibit Plaintiffs from acquiring, possessing, and using a suppressor. As such it violates Plaintiffs' Second Amendment rights.

69. Defendants' laws, customs, practices and policies generally banning the acquisition, possession, carrying and use of suppressors violates the Second Amendment to the United States Constitution, facially and as applied against the Plaintiffs in this action, damaging Plaintiffs in violation of 42 U.S.C. § 1983. Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against such laws, customs, policies, and practices.

## COUNT II

## (DECLARATORY JUDGMENT)

70. Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if set forth herein.

71. The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. 2201(a).

72. Absent a declaratory judgment, there is a substantial likelihood that Plaintiffs will suffer irreparable injury in the future.

73. There is an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment.

74. This Court possesses an independent basis for jurisdiction over the parties.

75. A judgment declaring that Defendants' policy which denies Plaintiffs the right to own, possess and acquire firearms is unconstitutional as applied to them.

76. Alternatively, a declaration that 720 ILCS 5/24-1(a)(6) and any other applicable law which prohibits Plaintiffs from owning suppressors as unconstitutional as applied to Plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1. An order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing 720 ILCS 5/24-1(a)(6) and any other applicable law which prohibits Plaintiffs from owning and banning the acquisition, possession, carrying or use of suppressors;

2. An order declaring that 720 ILCS 5/24-1(a)(6) and any other applicable law which prohibits Plaintiffs from owning suppressors is unconstitutional and violates the Second Amendment to the United States Constitution;

3. An order declaring 720 ILCS 5/24-1(a)(6) and any other applicable law which prohibits Plaintiffs from owning suppressors unenforceable;

4. Costs of suit, including attorney fees and costs pursuant to 42 U.S.C. §1988;

5. Such other Declaratory relief consistent with the injunction as appropriate; and

6. Such other further relief as the Court deems just and appropriate.

Dated:  February 9, 2023.

                    Respectfully submitted,

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh                    Alan Alexander Beck
Stambouliéh Law, PLLC                   Law Office of Alan Beck
P.O. Box 428                                           2692 Harcourt Drive
Olive Branch, MS  38654                  San Diego, CA  92123
(601) 852-3440                                    (619) 905-9105
stephen@sdslaw.us                           Alan.alexander.beck@gmail.com

**CERTIFICATE OF SERVICE**

I, Stephen D. Stamboulieh, counsel for Plaintiffs, hereby certify that on this day, I have caused to be filed the foregoing document or pleading with the District Court's ECF which sent a notice and a copy of the foregoing to all counsel of record.

Dated: February 9, 2023.

/s/ *Stephen D. Stamboulieh*
Stephen D. Stamboulieh