IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LARRY MORSE, et al. et al.,<br><br>    *Plaintiffs*,<br>v.<br>KWAME RAOUL, et al.,<br>    *Defendants*. | )<br>)<br>)<br>)<br>) CIVIL ACTION NO.<br>) 3:22-cv-02740-DWD<br>)<br>)<br>)<br>) |
| CARLIN ANDERSON, et al.,<br><br>    *Plaintiffs*,<br>v.<br>KWAME RAOUL, et al.,<br>    *Defendants*. | )<br>)<br>)<br>)<br>) CIVIL ACTION NO.<br>) 3:23-cv-00728-DWD<br>)<br>)<br>)<br>)<br>) |

### *ANDERSON* PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiffs Carlin Anderson and Dave Clark, by and through their undersigned counsel, respectfully submit this response to Defendant Kwame Raoul's Motion for Judgment on the Pleadings.

### INTRODUCTION

The Illinois ban at issue in this case violates the Second Amendment. Illinois flatly bans suppressors—items that are used to dampen (but not silence) the sound firearms make when firing. The Suppressor Ban is unconstitutional under a straightforward application of *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), and *District of Columbia v. Heller*, 554 U.S. 570 (2008). Under *Bruen*, the first task when confronting a Second Amendment claim is to determine whether "the Second Amendment's plain text covers an individual's conduct." 142 S. Ct. at 2129–30. Here, the relevant conduct in question is possessing a firearm equipped with a

1

suppressor. That conduct is covered by the plain text of the Second Amendment because a firearm equipped with a suppressor is an "arm." As the Supreme Court has established, an "arm" includes "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 581. What is more, the Second Amendment as a matter of plain text covers "*all* instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Bruen*, 142 S. Ct. 2111, 2132 (quoting *Heller*, 554 U.S. at 582) (emphasis added). Under this binding interpretation of the Second Amendment, a firearm equipped with a suppressor indisputably is an arm, and therefore possessing such a firearm indisputably is conduct covered by the plain text of the Second Amendment.

Because the Suppressor Ban implicates conduct covered by the plain text of the Second Amendment, Illinois has the burden to justify the law as consistent with the Nation's history of firearm regulation. Illinois will not be able to carry its burden. Under *Heller* and *Bruen*, the *only* arms that may be banned are "dangerous and unusual weapons." *Bruen*, 142 S. Ct. at 2128. Firearms equipped with suppressors are neither. They protect the hearing of firearms users and millions of them are owned by Americans. Because firearms equipped with suppressors are not dangerous and unusual, they cannot be banned.

Illinois does not attempt to meet its historical burden in the present motion. Instead, the State argues that since suppressors are not *themselves* firearms, the Suppressor Ban does not implicate the plain text of the Second Amendment. But this argument is nonsensical. The State does not purport to have any interest in banning suppressors apart from their operation with firearms. In other words, the Suppressor Ban is aimed at restricting the ability of citizens to use arms with the dampened sound they can have when equipped with a suppressor. A firearm equipped with a suppressor is no less of a protected "arm" than a firearm without one. It should

make no difference for Second Amendment analysis that the suppressors are not always permanently affixed to firearms.

The State claims that suppressors, unlike magazines or sights, are not useful for self-defense and so they are not protected parts of firearms. But that is wrong both in theory and application. The State is wrong in theory because there is no rule that a part of a firearm is only protected by the Second Amendment if it can be shown to be sufficiently important for self-defense. Rather, the Supreme Court has rejected that proposition and warned courts that they should not be in the business of making that sort of judgment. The State's argument is wrong in practice because suppressors *are* useful for self-defense, or for any other type of lawful use of a firearm. Without them, firearms present significant dangers to the hearing of their users and of any bystanders. Firearms create loud sounds that could easily disorient an individual and render them incapable of self-defense, and suppressors are the best (and sometimes the only) way to reduce their volume effectively. What is more, suppressors facilitate training with firearms by reducing the risk of hearing loss. For these reasons, the State's motion for judgment on the pleadings should be denied.

## BACKGROUND

Illinois bans "any device or attachment of any kind designed, used[,] or intended for use in silencing the report of any firearm." 720 ILCS 5/24-1(a)(6). The banned devices are commonly known as "silencers" or "suppressors," though suppressor is a much more accurate term as, contrary to depictions in Hollywood, a suppressed firearm is far from "silent"—it is more comparable to a firecracker or the peak decibel level of an ambulance siren. *See* Compl., Doc. 1 ¶ 42 (Feb. 27, 2023). Suppressors do, however, meaningfully reduce the concussive force and volume of the sound produced by a firearm to prevent ear damage for those near a firearm when it

is fired. *See* Brian J. Filgor, *Prevention of Hearing Loss from Noise Exposure*, BETTER HEARING INST. (2011), at 8, https://bit.ly/3YdRLTS. Even though suppressors are regulated under the National Firearms Act, *see* 26 U.S.C. § 5845(a)(7), they are very popular with Americans; they are legal to own in 42 states and have been the most registered NFA item in recent years. *Nat'l Firearms Commerce and Trafficking Assessment: Firearms in Commerce*, BATFE (May 5, 2022), at 99, https://bit.ly/3YX3fdD. Americans owned 2.6 million of them nationwide as of 2021, *Firearms Commerce in the United States: Annual Statistical Update 2021*, BATFE (2021), at 16, https://bit.ly/3E6kDV6, and that number certainly has increased since.

Plaintiffs Carlin Anderson and Dave Clark are adult American citizens, residents of Illinois, who are eligible under state and federal law to possess and acquire firearms. Compl. ¶¶ 12–13. Clark is an avid hunter who competes regularly in long-range rifle competitions. Compl. ¶ 48. He does not own any suppressors but he would purchase them and use them while hunting and practicing were it not for the Suppressor Ban. Compl. ¶¶ 46–47. Anderson *does* own a suppressor, but due to the Suppressor Ban he cannot possess it lawfully in Illinois and instead has surrendered it to the care of a relative who lives out of state. Compl. at 12, ¶ 2. If it were not for the Suppressor Ban, Anderson would possess and use his suppressor in Illinois and purchase additional suppressors for other of his firearms. Compl. at 12, ¶¶ 3–5. Defendants Kwame Raoul, Brendan F. Kelly, Bryan Robbins, and Craig Miller (collectively, "State") all enforce the Suppressor Ban under state law. Compl. ¶¶ 14–17.

## ARGUMENT

### I. The Suppressor Ban Prohibits Conduct Covered by the Plain Text of the Second Amendment.

Under *Bruen*, the first question any court, faced with a claim that a law violates the Second Amendment, must ask is this: does the plain text of the Second Amendment cover conduct

regulated by the challenged law? *See Bruen*, 142 S. Ct. at 2126. Illinois claims it is entitled to judgment in its favor because the suppressors that it bans do not implicate the plain text of the Second Amendment. That argument is impossible to square with the Supreme Court's binding interpretation of the Second Amendment.

The text of the Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In *Heller* the Supreme Court definitively construed the word "arms" in the Amendment to mean "[w]eapons of offence, or armour of defence," *Heller*, 554 U.S. at 581 (quoting Johnson, 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978)), or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another," *id.* (quoting 1 A New and Complete Law Dictionary). And in *Bruen*, the Court reaffirmed that these definitions control textual analysis of the Second Amendment, further noting that "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense." 142 S. Ct. at 2132; *see also Heller*, 554 U.S. at 582 ("[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."). The State outright rejects this formulation from *Bruen*, arguing that case was "not treading new ground," but merely reaffirming what *Heller* had already taught on this point. Defs.' Mot. for J. on the Pleadings, Doc. 68 at 8–9 (June 26, 2023) ("Mot."). It is hard to understand how the State can note that the sentence is part of "a summary of existing law" and simultaneously claim that Plaintiffs "pluck out of context" this language when we quote it precisely to summarize the Supreme Court's binding interpretation of "arm" in the Second Amendment. *See* Mot. at 8.

Of course, a suppressor, by itself, is not capable of expelling a projectile, but *no part* of a firearm is. Yet regulation of an ammunition magazine, a rifle barrel, a set of sights, or a trigger would regulate the firearm itself. *See, e.g.*, *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 116 (3d Cir. 2018) ("*ANJRPC*") (holding magazine are "arms"). If the Second Amendment is to mean anything, then an "arm" must include not just complete firearms but also component parts that function with the firearm. And any ban on a component part of a firearm should not be understood merely as a ban on that part, but a ban on firearms that function with that part.

A simple example exposes the flaw in the State's reasoning: If Illinois decided to ban laser-dot sights, the effect of that ban would not be to make it so that Illinoisans could not own laser pointers, but rather that they could not own a firearm *with the ability to aim through the use of a laser*. Or when Illinois recently did ban rifle ammunition magazines capable of holding more than 10 rounds, what it was doing was, in effect, banning *rifles* that are able to fire 11 or more times without reloading. 720 ILCS 5/24-1.10(a)(1)–(2). One district court, assessing that law, had no difficulty finding that magazines—though they could not function *themselves* as firearms—were nevertheless "arms" within the Second Amendment because even the State's expert could not describe a firearm without describing its ammunition capacity (a function, strictly speaking, of the magazine, not the gun). *Barnett v. Raoul*, --- F. Supp. 3d ----, 2023 WL 3160285, at *8 (S.D. Ill. Apr. 28, 2023) (McGlynn, J.); *see also id.* ("[T]his is not even a close call.") (citation omitted). The ban on suppressors is the same; it is really a ban on firearms that are capable of firing while having their volume reduced for safety and for comfort.

That Illinois is in fact banning a type of firearm by proxy when it regulates magazines should be self-evident: if suppressors are not "arms" and they are just metal tubes that are not

6

capable of functioning as an arm, then there is no reason for Illinois to ban them. As such, it is relevant that federal law explicitly labels suppressors as "firearms," *see, e.g.*, 18 U.S.C. § 921(a)(3)(C), not because a statutory definition can change the meaning of the constitution or even shed light on constitutional text, *contra* Mot. at 7, but because it demonstrates the obvious point that the reason for regulating these items is because they are, in every relevant respect, arms.

The State accepts that *some* firearm components must be protected by the Second Amendment, but it attempts to distinguish suppressors from the aforementioned magazines and sights, suggesting that there is a meaningful difference between those items that "contain, feed, or project ammunition" or "serve any intrinsic self-defense purpose," and suppressors, and that the former all qualify for Second Amendment protection while the latter does not. Mot. at 7 (quoting *Hasson*, 2019 WL 4573424, at *4). But there is no warrant in the text of the Second Amendment for such a distinction and it is hard to explain why such a rule should obtain unless to permit the State to carve out an exception for *this* case. Where bans on items that would fail this test are in issue, the State has advanced an entirely different (and equally insupportable) test. *See* Br. of State Defs., *Barnett v. Raoul*, No. 23-1825, Doc. 47 at 17–18 (7th Cir. June 5, 2023) (arguing magazines, items that "contain, feed, or project ammunition," are not arms because they are "accessories" or "accoutrements"). And adopting the State's gerrymandered test, which would require this Court to divine between items that change a firearm's functionality in a way that promotes self-defense and items that change its functionality purportedly without bringing self-defense benefits is antithetical to the Supreme Court's Second Amendment decisions. In *Heller*, the Supreme Court was faced with arguments that handguns—the type of firearm that the District of Columbia had banned— were poor choices for self-defense and that other firearms (shotguns and rifles) were better suited for the plaintiffs' needs. *See, e.g.*, Br. of Violence Pol'y Ctr. & Police Chiefs of L.A., Minneapolis,

and Seattle as *Amici Curiae* in Supp. of Pet'rs, 2008 WL 136348 at *29–30, *District of Columbia v. Heller*, No. 07-290 (Jan. 11, 2008). It refused to go down that road. Instead, it noted that there were "many reasons that a citizen may prefer a handgun," but that, ultimately, the real reason was immaterial, *Heller*, 554 U.S. at 629, since handguns were popular with Americans. And in *Bruen*, the Supreme Court made even clearer it is *not* the job of the courts to determine whether an arm that a state wishes to ban is useful enough for self-defense to preclude the state from doing so. 142 S. Ct. at 2127. Illinois has merely repackaged an argument that the Supreme Court has twice rejected as a part of the threshold textual inquiry. This Court should reject it out of hand under binding Supreme Court precedent.

For the same reason, the State is wrong to argue the Second Amendment only protects items that are "necessary to the effective use" of firearms. Mot. at 10. The State purports to draw that limitation from *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) (ban on firing ranges), and *Jackson v. City & County of San Francisco*, 746 F.3d 953 (9th Cir. 2014) (ban on ammunition sales), *see* Mot. at 10, but neither case established that the Second Amendment protects *only* those items necessary to the use of a firearm, just that it *at least* must protect such items.

II.  **Suppressors Perform Critical Functions in the Use of Firearms for Self-Defense and Other Lawful Purposes.**

Even if the standard were heightened and it were up to Plaintiffs to prove, as part of the textual inquiry under *Bruen*, that suppressors really were necessary to the effective use of firearms or helpful in self-defense situations (and to be clear, it is not), they could do so. When a firearm is fired, gases are emitted, along with a bullet, from the barrel. Those gases are very hot and they rapidly cool on contact with the air. The release of the gases is referred to as "muzzle blast," which is the main source of noise from a firearm being fired. William Murphy, et al., *The reduction of gunshot noise and auditory risk through the use of firearm suppressors and low-velocity*

8

*ammunition*, 57 INT'L J. AUDIOLOGY S28 (2018), *available at* https://bit.ly/3OaMPdO. And it can be *very* loud. Sound intensity is measured in decibels, which denotes the pressure a noise produces on a listener's eardrum. Because the decibel scale is logarithmic, small increases in decibel level reflect large increases in pressure—a sound that is three decibels louder than another produces twice the sound intensity, and a 10-decibel difference denotes a sound that produces *ten times* as much pressure. In terms of sound perception, a 10-decibel increase is perceived as twice as loud. That means a 70-decibel sound, approximately the volume of a vacuum cleaner, is perceived as half as loud as an 80-decibel sound like a garbage disposal. *Noise Sources and Their Effects*, PURDUE UNIV., https://bit.ly/3Ordnsy (last visited July 25, 2023). Live rock music at a concert is usually somewhere around 110 decibels (the level at which pain often begins), and the deck of an aircraft carrier registers at 140 decibels. *Id.* The CDC recommends that individuals avoid exposure to 100-decibel sounds for longer than 15 minutes and suggests avoiding sounds over 140 decibels entirely as, at that level, even momentary exposure risks hearing loss. *Noise and Occupational Hearing Loss*, NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, *available at* https://bit.ly/3OrJBUC (last visited July 25, 2023).

   An AR-15, fired without a suppressor, produces a 162-decibel sound, and even a .22-caliber pistol, a very small firearm, produces sound approximately at the 140-decibel limit. Glenn Kessler, *Are firearms with a silencer quiet?*, WASH. POST (Mar. 20, 2017), https://wapo.st/3KcOz59; *see also* Murphy, et al., *supra* 57 INT'L J. AUDIOLOGY 2. Some firearms produce sounds that register, at the shooter's ear, at over 180 decibels (or *10,000 times* the pressure at the cutoff for sounds that are safe for any length of time). Colleen G. Le Prell, *An overview of HPDs, new legislation, and recommendations for rifles with silencers*, THE HEARING REVIEW (Dec. 2017),

https://bit.ly/3qbQlfP. Even minimal exposure to unsuppressed gunfire is dangerous both for the shooter and for bystanders.

There are two potential solutions to this problem—personal protective equipment like earmuffs and earplugs (sometimes both at the same time) can be worn, and firearms can be made quieter by attaching a suppressor. Attaching a suppressor to a firearm is a type of "engineering control"—or physical modification to the noise-producing equipment. NIOSH rates "engineering controls" as significantly more effective than PPE (which it labels the least effective method of noise control). *Noise and Occupational Hearing Loss*, *supra.* And practice bears this out. In laboratory settings, both PPE and suppressors are shown to have similar effectiveness, with both reducing the sound of gunfire by 20-30 decibels. Kessler, *Are Firearms with a Silencer Quiet?*, *supra*. The ability of suppressors to reduce the noise of gunfire by this amount is well demonstrated. *See, e.g.*, William J. Murphy, et al., *Developing a Method to Assess Noise Reduction of Firearm Suppressors for Small-Caliber Weapons*, 33 PROCEEDINGS OF MEETINGS ON ACOUSTICS 1, 6, Table 2 (2018), https://bit.ly/43FtAPc (showing approximately 20-30 decibel reductions for 13 different firearms). And unfortunately, the effectiveness of PPE is significantly overstated in laboratory testing. Earplug manufacturer 3M recommends that individuals revise claims about the effectiveness of hearing protection devices (like earplugs and earmuffs) by cutting their claimed reduction abilities in half. *How to Use the Noise Reduction Rating (NRR)*, 3M EDUCATION (2000), https://bit.ly/43GxVl5.

Suppressors are the best form of hearing protection for firearms use. One meta-analysis found, after reviewing 20 published studies, that even 3M overestimated the effectiveness of earmuffs and earplugs: the laboratory NRRs [Noise Reduction Ratios] consistently overestimated the real-world NRRs by 140% to 2000%." Matthew P. Branch, *Comparison of Muzzle Suppression*

*and Ear-Level Hearing Protection in Firearm Use*, 144(6) OTOLARYNGOL HEAD NECK SURG. 950, 951 (June 2011), https://bit.ly/4511hvO. That same study found that "all suppressors offered significantly greater noise reduction than ear-level protection, usually greater than 50% better," with PPE producing an average reduction of 5-10 decibels compared to 30 decibel reduction by the four suppressors tested. *Id*. It is no surprise then that the CDC has called suppressors "[t]he *only* potentially effective noise control method to reduce . . . noise exposure from gunfire," Lila Chen & Scott E. Brueck, *Noise and Lead Exposures at an Outdoor Firing Range – California*, NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH (Sept. 2011), at 5, https://bit.ly/3YSzcDD, and the National Hearing Conservation Association Task Force on Prevention of Noise-Induced Hearing Loss from Firearm noise recommends the use of suppressors to reduce the risk of hearing loss. Michael Stewart, et al., *NHCA Position Statement: Recreational Firearm Noise*, NAT'L HEARING CONSERVATION ASS'N (Mar. 16, 2017), https://bit.ly/3EdVIir.

In addition to their greater efficacy, suppressors have other intrinsic advantages over earmuffs or earplugs. First, a suppressor protects *other people*, not just the shooter. Whether a firearm is fired at a shooting range, from a tree stand while hunting, or in a self-defense situation, the suppressor *globally* reduces the volume of the sound produced by firing a firearm, so that an individual who has removed earplugs and is just leaving the range or a hunting partner who is trying to listen for game is still protected. Indeed, suppressors can be even more effective for bystanders than they are for shooters. *See* Edward Lobarinas, et al., *Differential effects of suppressors on hazardous sound pressure levels generated by AR-15 rifles: Considerations for recreational shooters, law enforcement, and the military*, 55 INT'L J. OF AUDIOLOGY S59, S63 (2015), https://bit.ly/44Xcqh0 (showing greater reduction in decibels one meter to the left of the muzzle than at the shooter's right or left ear). Second, a firearm can be stored with a suppressor

11

attached so that an individual's hearing is protected in the event that it is needed to repel a home invader but there is no time to also locate earplugs and earmuffs (or earplugs and earmuffs cannot be used because the individual needs to listen for the intruder). An unsuppressed Glock 17's 162-decibel sound, *see Relative Sound Pressure Levels in Decibels (dB) of Firearms*, NAT'L GUN TR. (July 21, 2017), https://bit.ly/3qc45Ho, is comparable to the 170-decibel sound produced by a "flashbang" grenade used to disable someone with light and sound. *How do flashbangs work?* CHARLOTTE EYE EAR NOSE & THROAT ASSOCS. (Mar. 11, 2020), https://bit.ly/3rLFU3e. Noises at that volume can cause temporary deafness and disorientation to the point of loss of balance (because the fluid of the inner ear is disrupted). *Id.* Obviously, avoiding disorientation and deafness is *crucial* to effective use of a firearm and highly beneficial in a self-defense situation, and it permits individuals to communicate and coordinate their self-defense activities. Third, suppressors offer additional important protections for individuals engaged in self-defense. In addition to dampening sound, suppressors reduce recoil and help reduce muzzle flinch, allowing greater control of a firearm and improved accuracy. *Do Suppressors Reduce Recoil?*, KINETIC RSCH. GRP., https://bit.ly/3I6A1Cb (last visited July 26, 2023).

Neither the State nor the cases on which it relies dispute that suppressors are useful for individuals who fire firearms and want to protect their hearing, but rather, they argue that they are not important enough. *See* Mot. at 11 (collecting cases). But as discussed above, there is no warrant in the plain text of the constitution, or in Supreme Court precedent, for this Court to make the call of how useful is useful enough to warrant Second Amendment protections. And in any event, the State is significantly underrepresenting the extent or importance of the benefits that suppressors can provide.

### III. At the Very Least, Suppressors Must Be Protected by Implication of the Plain Text of the Second Amendment.

Firearms with suppressors are "arms" within the meaning of the Second Amendment under binding Supreme Court precedent. But even if that were not the case, this Court should still deny the State's motion for judgment on the pleadings because suppressors facilitate the exercise of the Second Amendment right. Constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). For this reason, the Seventh Circuit in *Ezell* held that, even though the Second Amendment makes no mention of firing ranges or practicing with arms, "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." 651 F.3d at 704. Suppressors are similar to firing ranges in that they facilitate the exercise the Second Amendment right. Just as a firing range provides a place in which the discharge of a firearm is carefully controlled, preventing damage to property or injury to the user and to bystanders, a suppressor reduces the sound produced by firing a firearm to a much safer level, permitting the right to be exercised with as little risk to one's hearing as possible. And in fact, suppressors are key to making firing ranges *themselves* functional, since those are locations where the sounds of gunfire are concentrated. The noise suppression enabled by suppressors is crucial to realizing the benefits of the "training and practice" that the Seventh Circuit has already held is protected by the Second Amendment.

Indeed, the circumstances of the Plaintiffs in this case demonstrate the ways in which suppressors facilitate the exercise of Second Amendment rights. Plaintiff Anderson has alleged that he currently refrains from hunting because of the Suppressor Ban but would, if permitted, use suppressors to hunt safely and effectively while mitigating the risk of hearing damage. Compl. at

13

12, ¶ 5; *see also Heller*, 554 U.S. at 599 (noting that the Second Amendment protects the right to use firearms for hunting). He would also use them to improve safety while target shooting. *Id.* And Plaintiff Clark, who does hunt, would also find suppressors beneficial for hunting and target practice. *Id.* at ¶ 48. Because suppressors further this protected activity, they must be protected by the Second Amendment.

## CONCLUSION

For the foregoing reasons, the Court should deny the State's motion for judgment on the pleadings.

July 26, 2023

Respectfully submitted,

/s/ David H. Thompson
David H. Thompson*
Peter A. Patterson*
Athanasia O. Livas*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
alivas@cooperkirk.com

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
430 West Roosevelt Road
Wheaton, Illinois 60187
630.452.4547
dsigale@sigalelaw.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 26, 2023, I cause the foregoing to be filed using the CM/ECF system, which will send notification of such filing to counsel of record, who are registered CM/ECF participants.

/s/ David H. Thompson
David H. Thompson

*Attorney for Plaintiffs*