1

                    IN THE UNITED STATES DISTRICT COURT
2                      SOUTHERN DISTRICT OF ILLINOIS

3

LARRY MORSE, et al,          )
4                            )
            Plaintiff,       )
5                            )
v.                           )  No. 22-cv-02740
6                            )  East St. Louis, Illinois
KWAME RAOUL, et al,          )
7                            )  MOTION HEARING
            Defendant.       )
8

9

10

                        TRANSCRIPT OF PROCEEDINGS
11            BEFORE THE HONORABLE DAVID W. DUGAN
                        APRIL 30, 2025

12

13   APPEARANCES:

14   FOR THE PLAINTIFF:    MR. STEPHEN STAMBOULIEH
                           MS. ATHANASIA LIVAS
15

16   FOR THE DEFENDANT:    MR. DARREN KINKEAD
                           MS. KATHERINE ASFOUR
17

18

19

20
                        Erikia Schuster, RPR
21                        IL CSR #084-00
                         750 Missouri Avenue
22                  East St. Louis, IL  62201
                          618-482-9226
23             Erikia_Schuster@ilsd.uscourts.gov

24      *Proceedings recorded by mechanical stenography; transcript
             produced by computer-aided transcription.*
25

```
 1              (The hearing began at 10:03 a.m.)
 2          THE COURT:  Good morning, everyone.  I'm sorry I'm
 3   running a little late.  I'm going to have everyone identify
 4   themselves if you would, please, so we have you on the record
 5   starting with -- who is Plaintiff?  I don't know anybody here.
 6   We'll start with you, sir, if you would.
 7          MR. STAMBOULIEH:  Steven Stamboulieh for the Morse
 8   Plaintiffs.
 9          MS. LIVAS:  And I'm Anthanasia Livas for the Anderson
10   Plaintiffs.
11          MR. KINKEAD:  Good morning, Your Honor.  Darren
12   Kinkaed from the Attorney General's office, and I represent
13   the Attorney General, the director of the state police and the
14   state's attorneys of Cass and Cumberland Counties.
15          MS. ASFOUR:  Katherine Asfour for the State's
16   Attorney of Williamson County.
17          THE COURT:  Very good.  We're here on a motion
18   hearing for Document 68, which is the motion -- Defendant's
19   Motion for Judgment on the Pleadings.  I've read the material
20   I've been presented that are associated with the motion
21   obviously.  I'm familiar certainly with the *Barnett* decision
22   in some detail so it is your motion.  Is it Kinkaed or
23   Kinkaed?
24          MR. KINKAED:  Kinkaed.
25          THE COURT:  How do you wish to proceed?  Do you want
```

1   to make some argument on this?

2        MR. KINKEAD:  Your Honor, I would be happy to make

3   some argument.  If you have any particular questions, I would

4   be happy to answer those.

5        THE COURT:  I do.  However you want to proceed.  If

6   you have something prepared you would like to start with, that

7   is fine.  If you would rather start with the questioning I can

8   do that, too.

9        MR. KINKEAD:  I defer to you, Your Honor.

10       THE COURT:  Right off the bat, the main question I

11  have really doesn't involve the statute so much.  It is really

12  the motion.  And looking at Document 68, even on page one,

13  there's the assertion in your motion for judgment on the

14  pleadings that silencers are not weapons.  They are not used

15  for self-defense, and they are not necessary to effect the use

16  of a firearm, and I'm wondering how do I make the

17  determination that you're requesting without some extrinsic

18  evidence not otherwise appropriately considered under 12(c) so

19  go ahead, sir.

20       MR. KINKEAD:  May I speak from the podium?

21       THE COURT:  You may.  If that's where you would like

22  to speak from, that's fine.

23       MR. KINKEAD:  I appreciate the question.  Judgment --

24  a Motion for Judgment on the Pleadings is not the most typical

25  type of motion but as the Seventh Circuit case law that we

1    cited in the motion says it is really just a Motion to

2    Dismiss.  And so a Motion to Dismiss, we take the allegations

3    in the complaint as true and we say even if they are true,

4    Plaintiffs cannot prevail on their claim.  And I think that

5    there are sufficient allegations in both complaints as well as

6    I won't say concessions but maybe acknowledgments is a better

7    word in the responses that Plaintiff's filed to our motion

8    that would allow you to reach those questions.

9            So for example, I don't think that anyone here today

10   is contending that a silencer or a suppressor as Plaintiffs

11   say is, in fact, a weapon.  No one is making the argument that

12   the purpose of a silencer is to cast or strike at another

13   or -- you know, I think one of the judges in one of the cases

14   that we cited said, sure, you could throw a silencer at

15   someone and possibly hit them in the head and cause a bruise,

16   but that is true of, for example, a frozen banana as well,

17   almost anything, a computer.  If you threw it at someone, it

18   would hurt.  But the purpose is not to be used as a weapon and

19   in fact, it is not used as a weapon.

20           Again, I think the allegations in the complaint don't

21   say otherwise, and I think the acknowledgements in the

22   responses don't say otherwise either.

23           My view, Your Honor, is that there's not so much a

24   dispute about to what silencers are, what they're used for,

25   what the purpose of a silencer is, how they work.  No dispute

1    about anything related to that at least for purposes of today

2    because we're accepting the allegations as true.  The question

3    is given all that, as a matter of law, do they satisfy the

4    definition of arms in the Second Amendment.  And if they don't

5    satisfy the definition of arms in the Second Amendment, are

6    they nevertheless necessary for the use of such arms in the

7    sense that prohibiting the silencer would infringe on that

8    right?  Does that answer your question, Your Honor?

9         THE COURT:  Partly, so if I understand you correctly,

10   you're actually going down the avenue of *Twombly* and 12(b)(6)

11   and not summary judgment because you're not asking to convert

12   it, obviously, and I haven't converted it.  Is that true?

13        MR. KINKEAD:  That's correct, Your Honor.

14        THE COURT:  So really the only question is whether it

15   is plausibly pled?  It is a pretty low standard.

16        MR. KINKEAD:  That is correct.  And again, my

17   understanding is that in terms of the fact, no one is

18   disputing facts at this stage.  We're accepting the facts that

19   have been alleged in the complaint because that is what we are

20   required to do in a motion like this.  Of course, if we did go

21   further into the case, we would have the ability to challenge

22   some of those assertions, but we're not at this stage, Your

23   Honor.  We're accepting the factual assertions.  We're

24   accepting Plaintiffs' allegations, for example, about how

25   useful silencers are, the uses for which they were designed

1  and intended, to which they are actually put in states where

2  they're allowed, we're accepting all of that.  And the

3  argument is purely as a question of law, purely as a question

4  of applying normal constitutional interpretation techniques to

5  the language in the Second Amendment; do they constitute arms?

6  And if not, does banning them infringe on that right of

7  protection in the Second Amendment.

8          THE COURT:  Let's get past whether they are arms or

9  not so we can get to kind of the meat of it which I think is

10 stage two, and that really goes to whether they are necessary,

11 right?  That is really what I'm driving at.  That raises to me

12 the bigger question, and that is whether it is appropriately

13 under a 12(c) and not through some other means, because

14 there's allegations that there's issues used for self-defense,

15 for example.  Whether they're used for self-defense or not, I

16 may or may not know whether they're appropriately used for

17 self-defense, but I'm not allowed to interject my knowledge

18 into things.  That tells me I need somebody to tell me through

19 some evidentiary support whether that is true or not, the

20 question of whether they're widely or commonly used.

21          I was surprised in the briefings, I think it was

22 2.669 million suppressors or you call them silencers have been

23 licensed by ATF nationwide.  I'm totally surprised by that.  I

24 didn't think it was near that number.  So whether that is

25 approaching a common usage obviously outside of Illinois or

1   whatever other states might have banned it.  So I suppose my

2   -- and I'm really convinced my main concern here is whether I

3   can do this on a 12(c) without a supporting record.  I know

4   Judge McGlynn did that in his case in the *Barnett* case, and I

5   watched that as it proceeded because as we even discussed in a

6   status conference I was hoping we would have some guidance

7   from the Seventh on this one so I could get a better feel for

8   how they would view things.

9        One thing they did make clear is there was no record

10  initially when he made his initial ruling, and they sent it

11  back I think at least in part on that basis, and I don't want

12  to make that same error.  And that's the reason I have a

13  concern about doing it as a 12(c) at this stage.

14       Anything else you want to address that with, go

15  ahead, sir.

16       MR. KINKEAD:  Yes, Your Honor.  A couple of things.

17  So first of all, I just want to be clear about what happened

18  in the *Barnett* case before Judge McGlynn.  The Seventh Circuit

19  didn't send it back in the sense that they found he had done

20  something wrong or improper.  He did everything right in terms

21  of the procedure.  It was a preliminary injunction motion.  So

22  all four plaintiff groups before him had filed preliminary

23  injunctions, and of course, those move at a very rapid pace.

24  So I think the cases were filed in January and three months

25  later in April he was holding a hearing on those motions.  So

1   by necessity the factual development was expedited and there

2   was no live testimony.  Everyone agreed that could be decided

3   on the papers.  So there's nothing wrong about what he did.

4   By necessity, a preliminary injunction has to be done that way

5   because the argument is there is a violation of one's rights

6   occurring and the Court has to act quickly to determine

7   whether that is true or not, and if the Court thinks it is

8   true and the other elements are satisfied to enter that

9   injunction and protect those rights.

10        So again, nothing wrong about the process that Judge

11  McGlynn employed.  What the Seventh Circuit said in *Bevis*,

12  which is the name that the case took on once they got up there

13  because there were also cases in the Northern District that

14  had the same fact pattern and were consolidated for purposes

15  of appeal.  What the Seventh Circuit said in *Bevis* was that

16  they were comfortable making a determination based on the

17  preliminary record, but they recognized that things had moved

18  quickly and so because of that they invited the parties to

19  develop a more fulsome record in the district court below.

20        None of the parties had moved for either judgment of

21  the pleadings or filed a Motion to Dismiss.  In fact, my

22  recollection -- I was involved in those cases.  My

23  recollection is that we filed answers while the PI motions

24  were being heard.  So we did not in that case believe that the

25  complaints themselves had sufficient allegations where we

1   could say even if those are true we still win as a matter of

2   law.

3          So there was no preliminary motion of the type that

4   we have here in *Barnett* and the Seventh Circuit didn't say

5   that Judge McGlynn had done anything wrong.  It was purely

6   about the preliminary nature of the evidentiary hearing.

7          THE COURT:  I wasn't suggesting that.  What I was

8   suggesting is from a procedural standpoint I think there is a

9   lesson to be learned from that is to have, as you say, a

10  fulsome record on these things where there is an issue, and

11  that goes well beyond my initial statement about 12(c),

12  obviously, and that is more of a remedy than to address the

13  immediate problem, but I'm still concerned about the 12(c) and

14  the what I see is some disputed issues that go to the heart of

15  this that I mentioned earlier.  And that's where my initial

16  question to you was is how do we get around that without

17  converting it, which no one has asked me to do and I haven't

18  done that, obviously, for summary judgment purposes.  I

19  suppose that can be done in some way.  I'm not sure it can.

20  It just seems to me that whether it is plausibly pled given

21  the allegations, given your motion whether it can be decided

22  on paper without some supporting record because there has to

23  be a record as to whether these are used or -- outside of

24  Illinois, of course -- for purposes that already we know are

25  protected such as the practice shooting at the shooting range

1    and that sort of thing.  That's where my concern lies.  Do you

2    understand?

3            MR. KINKEAD:  Absolutely.  And Your Honor, what I

4    would say to that is that for present purposes we're not

5    disputing any of that.  There's no dispute, and I believe it

6    is alleged, and we have to accept those allegations at this

7    stage, it is alleged that people are using silencers.  I think

8    it is 42 states where they are lawful.  As long as you've

9    registered it with the feds and paid the tax that the National

10    Firearms Act requires, you can use a silencer.  And as you

11    said earlier, there's quite a lot of them according to the

12    ATF's latest report.  I mean, whether or not as a matter law

13    that is in common use is not a question that is implicated by

14    a motion that we brought today because, Your Honor --

15            THE COURT:  Sorry to interrupt you.  In your motion

16    in the first page, first paragraph, silencers are not weapons,

17    they are not used for self-defense.  That is the allegation in

18    the complaint, they are used for self-defense or can be used

19    for self-defense.  I'm not sure how you can say that then.  If

20    it is alleged and it is contrary to what you state in your

21    motion, how do I resolve that?

22            MR. KINKEAD:  What that phrase means, Your honor, in

23    the motion is that they are not used as a weapon.  So in other

24    words, what I said earlier, you can throw one at someone and

25    maybe give them a little black mark on their head, but that's

1   all that it does, right, and there's no dispute about that.

2   Again, it is sort of a pithy way to like draw your attention

3   at the beginning of the motion.  It is not our intent here to

4   argue today that no one is using silencers in any other state,

5   or as Plaintiffs have alleged that they would like to use

6   silencers, for example, when they're doing firing range

7   practice or when they have a gun in their home for

8   self-defense purposes they would like to have a silencer

9   attached to it and that if they did have a silencer attached

10   to it, it would reduce the noise that the gun would make if it

11   were fired.

12          THE COURT:  I'm familiar with that, but I suppose I'm

13   still hesitant and concerned because I asked you at the

14   beginning 12(b)(6) or Rule 56, and you're saying 12(b)(6),

15   *Twombly*, we're going to go that avenue.  Well, that case it

16   only comes down to plausibility and when there's allegations

17   in there that these are used for self-defense how am I

18   supposed to discern that is not plausible?

19          MR. KINKEAD:  We're not making a plausibility

20   argument, Your Honor.

21          THE COURT:  That is 12(b)(6).  So tell me what your

22   argument is because it looks like to me you're going the

23   avenue now of not 12(b)(6), *Twombly*, now you are going to the

24   judgment on the pleadings akin to Rule 56, summary judgment.

25          MR. KINKEAD:  Let me separate out two concepts.  So

1    *Twombly* and *Iqbal* are a particular application of 12(b)(6),

2    but they are not the only application.  So the plausibility

3    standard, if we were relying on that -- and we are not, just

4    to be clear -- but if we were relying on that, what we would

5    be saying is, yes, Plaintiffs have alleged this, but it is not

6    plausible, you shouldn't buy it.  Even though it says that in

7    the complaint, it is not plausible.  That's not what we're

8    saying.  We're accepting as true for these purposes everything

9    they say in the complaint.  So it is not really about

10   plausibility.

11           What it is about is given that factual pattern, given

12   the world as Plaintiffs allege it and the uses they allege

13   silencers or suppressors are put to, given all that, accepting

14   everything they say, as a matter of law are those devices

15   necessary to use an arm as defined in the Second Amendment for

16   the purposes for which it is protected by the Second

17   Amendment?  And that is a question you can decide based on the

18   allegations.  Why?  Because under *Bruin*, that is a burden that

19   falls on Plaintiffs.  So it is Plaintiffs' burden to show you,

20   to plead first and then to prove if the case gets to that

21   point, that silencers either are arms or if they are not arms

22   that they are necessary for the use of arms in the way that

23   the Second Amendment protects.  That is their burden, as I

24   said, to plead and then to prove under *Bruin*.

25           And so if they haven't done that, Your Honor, that

 1   means we should win at the pleading stage, which is

 2   essentially what the Motion For Judgment on the Pleadings is.

 3   And again, that is the world that I think we are in.  Nothing

 4   that you will hear from me today takes issue with anything

 5   that they have said in terms of the factual allegations either

 6   in their complaints or the losses that they have put on those

 7   factual allegations in their responses to my motion.  That is

 8   not on the table, Your Honor.  This is purely a question of

 9   law, what does the Second Amendment mean?  That is really the

10   heart of what today's argument is about.  And I would say,

11   Your Honor, we cited --  I think there were about a dozen

12   cases that we cited from the federal courts in --

13        THE COURT:  Let me stop you before you get to that.

14   Here is kind of the central part of my problem.  You used the

15   term -- I say your client does -- in its statute the term

16   silencer.  Are you using that interchangeably with suppressor?

17        MR. KINKEAD:  Yes.

18        THE COURT:  Across the board?

19        MR. KINKEAD:  Yes.

20        THE COURT:  So if an individual has a device on his

21   or her weapon that simply reduces the decibel level by a

22   tolerable range, even a few decibels, you're saying it is a

23   violation of your statute; is that true?

24        MR. KINKEAD:  That is my understanding.  I've got the

25   statutory text right here.

```
 1            THE COURT:  I've read it too.  You are using the term
 2   silencer and also using the term suppressor.  There is a
 3   functional difference.
 4            MR. KINKEAD:  Your Honor, the word silencer appears
 5   in our criminal code and the word suppressor does not and so I
 6   think we're --
 7            THE COURT:  That is the reason I just asked you if
 8   you were using those words interchangeably.
 9            MR. KINKEAD:  Yes.
10            THE COURT:  So if suppressor is something different
11   than silencer then a suppressor by its common meaning is not
12   covered by your statute?  Is that what you're telling the
13   Court?
14            MR. KINKEAD:  No, not at all.
15            THE COURT:  So you are including within that world of
16   silencers all suppressors?
17            MR. KINKEAD:  As Plaintiffs are using that term, it
18   is interchangeable with silencer.
19            THE COURT:  There lies the problem.  They are
20   suggesting in their complaint and in their argument as well
21   that the suppressors can be used in self-defense mode.  It can
22   also be used for practice.  It also affects accuracy.  Now, I
23   may have a little or may not have a little knowledge about
24   firearms, but it doesn't matter.  I think there has to be some
25   evidence that would suggest otherwise, otherwise you lose on
```

1    your motion, on your 12(c) motion.  I'm not suggesting that

2    you lose overall.  That is the problem I have is because I

3    cannot say with certainty that the items that the Plaintiffs

4    are referring to are not covered and protected by the Second

5    Amendment, and that is your burden.  Once they make the

6    pleading argument that it is covered by the Second Argument,

7    you have to show somehow it is not or there is a reason not

8    to, right, or it is not a historical meaning under *Bruin* and

9    so forth.

10           MR. KINKEAD:  That is correct, Your Honor.  If they

11   carry their burden to show that the conduct in which they wish

12   to engage, which is to use firearms that have suppressors

13   attached, is covered by the plain language of the Second

14   Amendment then the burden shifts to the state to show that the

15   regulation is consistent with our nation's historical

16   tradition of --

17           THE COURT:  How do I know that it is covered or not

18   covered without taking your word for it?  And I don't mean

19   that in a flippant way at all.  I am simply trying to point

20   out my concerns.  How do I reach the conclusion that these

21   suppressors that you claim are included within the definition

22   of silencers statutorily, how do I know that those are, in

23   fact, as you say they are?

24           MR. KINKEAD:  Well, Plaintiffs have alleged what they

25   are.  I mean, that's --

1        THE COURT:  But you're asking for a 12(c), a

2   dispositive motion.  You're asking me to make that

3   determination and I'm not sure how I do that unless I know

4   what a suppressor is.  In the *Murphy* case, the poor judge made

5   the mistake of saying -- conflating flash suppressors and

6   noise suppressors or report suppressors, a big difference,

7   right, because of lack of knowledge about firearms.  That's

8   what I'm saying.  I don't have, and I don't think I could

9   access even if I wanted to, knowledge about firearms and how

10  suppressors work versus silencers and whether one is covered

11  by the Second Amendment and something is not.  That is the

12  only concern I have is I think 12(c) requires more of you than

13  that.  Do you see what I'm driving at in this?

14        MR. KINKEAD:  I do, Your Honor.  I just want to

15  register my concern about because in my view this is no

16  different than any other case that comes to you on a 12(b)(6)

17  motion.  There are facts that are alleged.  Let's say it is a

18  car accident.  There are facts that are alleged about what

19  happened during that incident, and the job of the Court is not

20  to determine what really happened during that incident, not on

21  a 12(b)(6) motion.  The job of the Court on a 12(b)(6) motion

22  is to take as true what Plaintiffs have said about the car

23  accident and then apply the law to those facts.  And if

24  Plaintiffs haven't alleged the correct facts or if they have

25  gotten confused about what happened or they left some things

1    out, that is not the Court's burden to resolve for the

2    Plaintiffs.  The issue is how Plaintiffs pleaded facts

3    sufficient to carry their burden to move the case forward, and

4    that is what is at issue here, Your Honor.

5         You raised some good points and questions about the

6    application of silencers and suppressors.  If that information

7    is vital to your decision, and it is not included in the

8    complaint, that means there is a pleading problem on

9    Plaintiff's part.  And the solution is not to deny our motion

10   and move forward, but rather to grant our motion and perhaps

11   give them a chance to replead to add those facts to address

12   those concerns.  That is typically --

13        THE COURT:  That goes back to the plausibility in

14   *Twombly* then.  If I am going to do that, now you are kind of

15   backtracking back over to *Twombly* and whether it is plausibly

16   pled, right?

17        MR. KINKEAD:  Not in the sense that I'm doubting

18   anything they said.  I'm saying what they have pleaded is

19   insufficient because there are other areas that --

20        THE COURT:  If they've pled that it is necessary for

21   the use of the firearm, would that not be enough to get past

22   the hurdle that you're trying to construct?

23        MR. KINKEAD:  Yes.  But my view is as a matter of law

24   they have not pleaded those facts.  Again, we're accepting

25   everything that they say is true.  We're not saying it is

1    implausible.  We are not contesting any of the facts.  If

2    there are unanswered questions at the end of this, again, it

3    is their burden to show you, to plead and prove if the case

4    gets to that point, that their conduct, the conduct they wish

5    to engage in, is covered by the plain language of the Second

6    Amendment.  So if there are holes, if there are unanswered

7    questions, if they don't get all the way to showing that with

8    these pleadings, that is a problem for Plaintiffs.  That is

9    not a problem for our motion.

10          In other words, back to that car accident, right, if

11   it is just not clear from the complaint what happened, that

12   doesn't mean the defendant loses, that means the defendant

13   wins and the plaintiff perhaps gets to replead and add those

14   facts.  That is the analogy I think is most pertinent here.

15          THE COURT:  That is not what your motion does.  Your

16   motion doesn't point to factual inadequacies.  You simply just

17   say right off the top that this cannot go forward as a matter

18   of law because these are not protected under the Second

19   Amendment.  And my concern is that what if they are protected

20   by the Second Amendment and what if you're wrong in your

21   allegations in your motion, and that is really what it goes

22   to.  I have to accept your motion at face value in order to

23   grant it about safety, necessity, use at a range in effort of

24   self-defense.  I have to accept your pleading as factual and

25   appropriate before I can grant your 12(c) motion.

```
 1              MR. KINKEAD:  I disagree, Your Honor.

 2              THE COURT:  There are factual disputes.

 3              MR. KINKEAD:  I disagree.

 4              THE COURT:  You don't think there are any factual

 5    disputes?

 6              MR. KINKEAD:  If you can identify one for me, I'd be

 7    happy to address it, but we are --

 8              THE COURT:  There are allegations that they believe

 9    that this is necessary for self-defense.

10              MR. KINKEAD:  That is a question of law.  We don't

11    accept their allegations about necessity in terms of questions

12    of law, right?  We know from the allegations that Plaintiffs

13    are, in fact, using firearms in Illinois despite the fact that

14    they cannot possess silencers or suppressors.  They are using

15    them.

16              THE COURT:  That goes back to factual issues.

17              MR. KINKEAD:  Your Honor, I will just state for the

18    record I believe you are shifting the burden to the State at

19    the first step of the *Bruin* analysis.

20              THE COURT:  I'm only looking at your burden in terms

21    of 12(c).  That is as far as I'm taking your burden today, and

22    I think what I can see so far -- and I will wait for what the

23    Plaintiffs have to say -- but what I see so far is that you

24    don't measure up in the motion because there are, I think,

25    some disputed issues as far as I can see from it because you
```

1    are asking me to make a judgment, the matter of law, on

2    whether these suppressors or silencers, let's get around that

3    term, are protected by the Second Amendment or whether their

4    use is protected by the Second Amendment.  You're asking that

5    of me, right?

6             MR. KINKEAD:  Just to be clear, Plaintiffs are asking

7    that of you.

8             THE COURT:  But you're trying to -- are you trying to

9    stop me from doing that then with your motion?  But you're

10   asking the opposite side, you're asking me to make a

11   determination that it is not covered by the Second Amendment,

12   true?  That your statute is constitutionally appropriate.

13   That's what you're asking me in effect to do, right?

14            MR. KINKEAD:  Yes, Your Honor.  In the same sense

15   that when a defendant is hailed into court they're always

16   going to tell you that plaintiffs are wrong about what they

17   are asking the Court to do.  It is Plaintiffs who are asking

18   this Court to find that silencers are protected by the Second

19   Amendment and we say they have not carried their burden.  We

20   are not disputing facts.  At this stage we're not contesting

21   anything that they have pleaded or anything that they have

22   said in their responses that are based on those allegations.

23            We are saying as a matter of law -- and I'll just add

24   one thing, we are not saying either, that Plaintiffs have

25   failed to allege facts that could, if alleged, carry their

1    burden.  We're not saying there is a hole or a gap or

2    something missing.  Again, I think plaintiffs and defendants

3    in this case are not disputing any facts and are not disputing

4    that the facts in the complaint are sufficient for Your Honor

5    to make a decision.  What we are disputing is what do those

6    facts mean as a matter of law, and the reason this matters,

7    Your Honor, is because of the plain language of the Second

8    Amendment.  The Second Amendment says -- and let me quote this

9    because --

10           THE COURT:  I'm highly familiar with it, but go ahead

11   if you want.

12           MR. KINKEAD:  I don't mean to offend you, Your Honor.

13           THE COURT:  You are not offending me, but I think

14   you're missing the -- I think you're missing my point I should

15   say.  You're asking me to do the exact thing that the

16   Plaintiffs are asking me to do, just in reverse, and that is

17   to make a declaration that these silencers that I have never

18   seen, I have no idea really truly what you mean by silencer,

19   you're asking me to make a determination that those are not

20   covered by the Second Amendment, and they may not be.  I'm not

21   suggesting that they are or are not.  I don't know.  But I

22   don't know I can do that on a 12(c) motion.  In fact, I'm sure

23   I can't do that on a 12(c) motion.

24           MR. KINKEAD:  It sounds like there is nothing that I

25   can say at this point, Your Honor, that would cause you to --

```
 1          THE COURT:  If you have something to convince me

 2   otherwise, listen, I am all ears.  I am wrong every day so

 3   don't think for a moment that I am 100 percent sure of myself,

 4   but I am pretty sure.  But if you've got something further,

 5   please tell me about it.  I would be happy to hear.

 6          MR. KINKEAD:  May I quote from the Second Amendment

 7   just to set the stage?

 8          THE COURT:  Of course.

 9          MR. KINKEAD:  Here, Your Honor, the Second Amendment

10   says, and I'm only going to read the operative clause, not the

11   preparatory clause about the malitia.  It says the right of

12   the people to keep and bear arms shall not be infringed.  The

13   keyword -- there are two keywords here.  One is arms and one

14   is infringed.  So I think we're all on the same page that

15   silencers don't satisfy the definition of arms because arms

16   means weapons and silencers are not themselves weapons.  So

17   the question is nevertheless, even though they are not arms,

18   does banning them infringe the right of the people.

19          THE COURT:  I think the Plaintiffs are claiming they

20   are, am I wrong in that?

21          MS. LIVAS:  That is correct, Your Honor.

22          THE COURT:  That is dispute number one.  But go

23   ahead, sir.

24          MR. KINKEAD:  Your Honor, I don't think there is

25   anything I can say at this point.  I mean, I just don't know.
```

```
 1    I'm trying to explain this to you.

 2              THE COURT:  Please do.  Educate me, please.

 3              MR. KINKEAD:  I will go back and talk about arms then

 4    because apparently there is a disagreement, but it is not a

 5    factual agreement.  It is a matter of law, right?  Justice

 6    Scalia in the Heller decision told us what an arm is.  He

 7    consulted dictionaries from 1791 or thereabouts, and in those

 8    definitions one was weapons of offense or armor of defense.

 9    One was anything that a man wears for his defense or takes

10    into his hands or useth in wrath to cast out or strike

11    another.  Those are the dictionary definitions from 1791.

12              And the reason why it matters, Your Honor, is because

13    the Second Amendment, in a sense, is fixed in time.  It is

14    fixed in time because the words that are in the Second

15    Amendment have the same meaning today that they had in 1791

16    when they were adopted.  So arms means today the same thing

17    that it meant in 1791.  It is pretty simple, Your Honor.

18    Here, because --

19              THE COURT:  It is amazing.  I am much older than you,

20    but when I was in law school it was known as the living

21    document and now we've reverted back to no, no, no, it is

22    original meaning, originalists, but go ahead.  I just wanted

23    to make that detour.  That is of some interest to me.

24              MR. KINKEAD:  I learned about in law school legal

25    realism, right?  There used to be the idea that judges sort of
```

1  plucked the law from the air.  It is a natural rule just like

2  the rules of physics or any other --

3  　　　　THE COURT:  Natural law.

4  　　　　MR. KINKEAD:  Yes.  But the idea was that judges'

5  views don't come into play.  It is out there floating around

6  and you pull it in, right, and now we all recognize that we

7  all come to this with our own views, and that's why I think

8  the original intent interpretation is so important because it

9  shouldn't matter what someone today thinks is good policy or

10  bad policy when it comes to the Second Amendment.  What

11  matters is what did the people enact in 1791.  And that's why

12  we look at the language from 1791 because we don't --

13  　　　　THE COURT:  Silencers and suppressors, I understand,

14  didn't exist then, but that is not the standard we know,

15  right?

16  　　　　MR. KINKEAD:  No.  In one sense the word arms is

17  static because the definition is always going to be that 1791

18  definition.  If, you know, in 2400 or 2500, we think of arms

19  as being something complete different in normal society, it

20  won't matter for purposes of the Second Amendment.  It will

21  still be the 1791 definition.  So it is static in that sense.

22  It draws a boundary based on 1791.

23  　　　　But there are things today that didn't exist in 1791

24  that may nevertheless fall within that boundary.  An example

25  from the Supreme Court is stun guns.  That is the *Caetano*

1    case, C-A-E-T-A-N-O.  Obviously, stun guns didn't exist in

2    1791, but they satisfy the 1791 definition of arms; and so

3    therefore, they are protected.  So in that sense, it is fixed.

4    It is static, but it is also fluid.  The boundary remains the

5    same, but new things can emerge within it that didn't exist at

6    the time.

7         THE COURT:  I'm sorry.  In all my reading I have not

8    seen that.  Is there some case that does that analysis of

9    fixed versus fluid and static?

10        MR. KINKEAD:  I think the best case for our purposes

11   is the *Cox,* C-O-X, case from the Tenth Circuit, which we cited

12   in our papers.  That is one of the more recent Appellate Court

13   cases.  It is from the Tenth Circuit, which addresses whether

14   or not silencers are protected by the Second Amendment.  And

15   what the *Cox* court says is essentially what I just said, yes,

16   1791 definition controls, but new devices can fall within that

17   definition that didn't exist then.  Cox makes that point, I

18   think it is in a sentence or two.  There is not an exhaustive

19   analysis.

20        But, again, I don't think there is any dispute that

21   the definition, again, sets a boundary, but what is inside the

22   definition can change over time because new items are created

23   that satisfy that definition.

24        So, again, for our purposes, though, arms means

25   weapons, and there is no case law that I'm aware of -- and I

1    guess I should say, Your Honor, weapons in the sense that an

2    ordinary person, not a lawyer or someone with technical

3    knowledge of guns or firearms or anything else would think of

4    as a weapon.  What an ordinary person would think of as a

5    weapon.  And so the test I have in my mind is you take a

6    silencer, put it in your hand, walk around St. Clair County,

7    go across the river to St. Louis and ask people on the street

8    is this a weapon?  And the answer is going to be no because it

9    is not a weapon in the ordinary sense.  I don't think there is

10   any dispute about whether or not it is a weapon.

11            THE COURT:  They dispute it.

12            MR. KINKAED:  They dispute whether or not it is an

13   arm.  Are you disputing whether it is weapon?

14            MS. LIVAS:  I'm happy to address it when we are at

15   the podium.

16            THE COURT:  All right.  I didn't mean to get ahead of

17   you, sir.  Go ahead.

18            MR. KINKEAD:  I'm not going to characterize their

19   position.  You'll find out when they speak, I guess.  But in

20   my view there is no world in which a silencer is a weapon.

21   Again, there is no court that has found it is a weapon.

22   Plaintiffs are asking you to be the first court anywhere to

23   find that is a weapon, and I just don't find the argument to

24   be -- if that is their argument, which I did not know until

25   this point, to be one that is very strong.  So again, they are

1    not weapons.  As every court who has considered it says the

2    most you can do with a silencer is throw it at someone.

3         THE COURT:  What are arms?  Are they arms?

4         MR. KINKEAD:  No, because arms means weapons.  Arms

5    means weapons, and so if it not a weapon, it is not an arm.

6    In fact, what we know -- and again, I think Plaintiffs will

7    disagree with this as a matter of law, but the *Bevis* case from

8    the Seventh Circuit tells us that actually arms doesn't even

9    include all weapons.  *Bevis*, the binding case law from the

10   Seventh Circuit, says arms means something less than weapons

11   because some weapons are not arms protected by the Second

12   Amendment.  The two types or categories I should say of

13   weapons that the Seventh Circuit says are not included within

14   the definition of arms are weapons that are exclusively or

15   predominantly useful in military service.

16        Again, the ordinary person on the street would say it

17   is a weapon.  It looks like a weapon, right?  Seventh Circuit

18   says, no, it is not an arm for purposes of the Second

19   Amendment.  The other category is weapons that are not

20   possessed for lawful purposes, so again, things that are

21   weapons within the ordinary sense, but according to the

22   Seventh Circuit are not arms within the meaning of the Second

23   Amendment.

24        So just to recap that, Your Honor, there is no

25   authority that I'm aware of that says the word arms in the

1    Second Amendment means anything more than weapons.  In fact,

2    we have the Seventh Circuit in the *Bevis* saying that it means

3    something less than all weapons.  And again, I don't think

4    that there is any allegation in the complaint or any true

5    factual dispute that silencers are used themselves as weapons.

6    There is no court that has ever found that.

7         THE COURT:  What about accoutrements or pertinences?

8    I'm not sure what Judge Kavanaugh -- which term he used off of

9    the top of my head.  It may have been accoutrements maybe is

10   the word that he used.  That is some things as you point out

11   that are not arms by themselves, but they're necessary too, so

12   I think that is really where you're headed, right?

13        MR. KINKEAD:  Exactly.  You're exactly right, Your

14   Honor.  That, in my view, is the heart of the dispute.  I

15   guess I'll find out in a second whether or not that is the

16   heart of the dispute.  But in my view that is the heart of the

17   dispute.  No one is seriously contending that silencers are

18   weapons, but that is not dispositive because the Second

19   Amendment protects more than just arms.  That also is binding

20   case law from the Seventh Circuit.  It doesn't protect them

21   because they are arms, but it protects them because they are

22   necessary for the use of arms.

23        And what I want to do, Your Honor, and I think this

24   is critically important given the questions that you were

25   asking is explain to you why that is a question of law and not

1      a question of fact.

2            So the word firearm accessories has also been used,

3      accoutrements.  Our view is that the test you can say in

4      shorthand is that firearm accessories or accoutrements are

5      protected by the Second Amendment if they are necessary for

6      the use of arms, but that is just a shorthand.  It has to be

7      derived from the Second Amendment, and I'd like to show you

8      how it is.  And again, it says the right of the people to keep

9      and bear arms shall not be infringed.  The keyword now is

10     infringed.

11           So we cited this in our reply, but we just did what

12     Justice Scalia did in *Heller*.  We looked up the word infringed

13     in a 1791 dictionary.  I think it might technically be from

14     1792, but there's no allegation that there is anything

15     materially distinct in that one-year period.  The definition

16     of infringe is violate, to destroy, to hinder.  And hinder, we

17     also looked that up, to obstruct, to stop or to impede.  So

18     putting the Second Amendment in plain English, what it means

19     is -- and this is also consistent with what Justice Scalia did

20     in *Heller*, he went through the dictionaries and then he

21     recasted in plain English.  The right to keep and bear

22     weapons, that is arms, the right to keep and bear weapons

23     shall not be destroyed, shall not be stopped.  That is what

24     infringe means there.  That makes perfect sense, Your Honor.

25           The two cases that we've cited I think are common

1    sense, right?  The first one is from the Ninth Circuit.  That

2    is the *Jackson* case, I believe.  *Jackson vs. San Francisco.*

3    And the issue there was bullets.  The City of San Francisco

4    had restrictions on possession of bullets.  Bullets are not

5    themselves weapons.

6         THE COURT:  Hallow point bullets I think it was.

7         MR. KINKEAD:  That's correct.  They are not

8    themselves weapons, Your Honor.  No one is seriously

9    contending in that case that they were arms.  A bullet is not

10   a weapon; therefore, it is not an arm.  But again, this is

11   common sense.  If you prevent people from possessing bullets,

12   you're effectively preventing them from using an arm or weapon

13   effectively.  It doesn't work.  Expelling a projectile is the

14   entire point of a firearm.  It cannot be used for

15   self-defense.

16        THE COURT:  Necessary.

17        MR. KINKEAD:  Yes.  Necessary because -- again, this

18   is connecting it back to the text because it would infringe

19   the right to keep and bear arms if it weren't allowed.  It

20   would destroy that right.  If you ban bullets or even just a

21   category of them, it would destroy that right, and that is how

22   it is connected to the plain language of the Second Amendment.

23   That is why this is a step one of a *Bruin* inquiry, and that is

24   a question of law.  The best as I understand there was no

25   factual discovery in the Jackson case.  They simply accepted

1    the allegations as they were alleged in the complaint, but

2    again, I may be wrong about that.  That is my recollection

3    from reading it recently, but I don't believe there was any

4    factual development.  So you can see, Your Honor, how the

5    *Jackson* case fits squarely within the argument that we are

6    making today.

7          The other case -- and this is binding because it is

8    from the Seventh Circuit -- is the *Ezell* Case, E-Z-E-L-L, and

9    that didn't concern a device or a physical object at all.

10   That concerned range training, an activity, but the Seventh

11   Circuit found that range training is nevertheless protected by

12   the Second Amendment.  In fact, they sort of brushed aside the

13   notion that it wouldn't be very quickly because they said what

14   is the point of owning a firearm for self-defense if you don't

15   know how to use it, if you're not able to get the practice and

16   the skill development that you need to use your weapon

17   effectively in a self-defense situation, you're essentially

18   destroying the right to keep and bear arms for self-defense.

19         Again, if you have a weapon and it has no bullets, it

20   is worthless.  If you have a weapon and you don't know how to

21   use it, it is worthless.  So in both instances the Second

22   Amendment right to keep and bear arms is infringed because it

23   is essentially destroyed, even though that activity and even

24   though that object are not themselves arms.  That's the

25   territory I think we're in, Your Honor, and I can continue

1    to --

2           THE COURT:  I'm familiar with the cases.  I'll tell

3    you that up front.  The *Ezell* case, I don't want to get into

4    an argument about this, but I see a fundamental difference

5    because there the Court found that being able to use a range

6    is essential to exercising your Second Amendment rights, and I

7    don't disagree, obviously, with that at any level, but some

8    people have never been to a range.  And so I'm not sure you

9    can use that analogy perfectly because some people have never

10   been to a range and still know how to shoot effectively to

11   defend themselves.  So I know where you're headed with that,

12   and I get that to try and determine what is necessary and what

13   is not necessary to carry out the exercise of your Second

14   Amendment rights, but I do appreciate that.

15          One question I had for you -- and this is really

16   somewhat out of curiosity -- is what interest does State of

17   Illinois have in banning the use of or possession of, even,

18   silencers or suppressors?  What are they basing that on?

19          MR. KINKEAD:  Your Honor, this law dates back as far

20   as I understand prior to 1961 when our criminal code was first

21   codified.  This is not a case like the assault weapons case

22   that Judge McGlynn had where there is a recent legislative

23   development and we have legislative history and the committee

24   reports and all of that, and I'm not prepared to make a

25   definitive assertion in response to your question today

1    because it is not our burden at step one to show you that it

2    is the good law.  What I was going to say, Your Honor --

3              THE COURT:  I'm just asking you a question.

4              MR. KINKEAD:  No, I understand.

5              THE COURT:  That's all I was doing is asking you a

6    question what is the State of Illinois's asserted interest in

7    banning these?  That is a simple question.

8              MR. KINKEAD:  I understand, Your Honor, and I'm

9    trying to answer it.

10             THE COURT:  Please do.

11             MR. KINKEAD:  The answer is it is not our burden at

12   this stage.

13             THE COURT:  That is not an answer.  That is an

14   avoidance.  If you don't want to answer it, just tell me you

15   don't want to answer it.  That is fine.  I'm curious what is

16   the interest in the State of Illinois, the asserted interest,

17   to ban these?  That is all I'm asking.

18             MR. KINKEAD:  I'm not prepared to make that, Your

19   Honor, because it is not my burden.  In other words like this

20   is not a situation where I --

21             THE COURT:  I understand.  Let's go onto something

22   else.  If you're not going to answer, just be forthright with

23   me and tell me you can't answer it for whatever reason.

24             MR. KINKEAD:  Your Honor, I was trying to do that.

25             THE COURT:  You were avoiding the question.

1          MR. KINKEAD:  Your Honor, I can't make an assertion

2     on behalf of the State of Illinois without running it through

3     the people at my office, going through the regular chain of

4     command, and we have not done that in connection with this

5     motion because it is not necessary.

6          THE COURT:  Okay.  All right.  Very good.  Let's go

7     to the Plaintiffs and see what they have to say then.

8          MS. LIVAS:  Good morning, Your Honor, for the

9     Anderson Plaintiffs.  I need to make a few important

10    corrections about the record and about the applicable tests.

11    First, we are not on the same page about whether suppressors

12    are arms or not, and it should come as no surprise that our

13    position is that a firearm outfitted with a suppressor is an

14    arm entitled to Second Amendment protection.  That was our

15    lead argument in our response.  It was only our second

16    argument in the alternative, the sort of *Ezell* type necessary

17    accoutrement sort of second order level of protection.  So we

18    do believe that a firearm outfitted with a suppressor is

19    protected by the Second Amendment, and that should not be

20    mischaracterized or misconstrued.

21          The reason for the disagreement, as I understand it,

22    is that the State is adopting a different and narrower test of

23    what qualifies as an arm.  So they assert that an arm equals a

24    weapon.  We disagree with that characterization.  The Supreme

25    Court has provided the applicable tests, first in *Heller*.

*Heller* tells us that an arm is anything that provides an armor of defense or that one takes into his hands or uses to cast at another, and those are all ors so it is a disjunctive test. *And then Bruin* says an arm is any instrument that constitutes a bearable arm. So anything that sort of makes up what is ultimately something that someone can bear and use as a firearm. Those are the tests. It is not weapon. I guess in shorthand I don't really know where it comes from, but those are the tests that the Supreme Court has provided.

Moving onto the *Bruin* test, it should be made clear the State makes no argument on step two of *Bruin*. They only make a step one argument, and it is their burden on step two to show that this ban is consistent with historical tradition and the only way they can do that under Supreme Court precedent is to say that suppressors or firearms outfitted with suppressors are dangerous or unusual. They have made zero argument. They've conceded that point. So that alone is reason enough to deny the motion.

On the question of the record facts, we believe these are largely legislative facts and we have pled extensive legislative evidence that the Court can consider about self-defense and the necessity of suppressors to the safest and most effective use of a firearm. Training, as well as protection of bystanders, and the State has not meaningfully disputed any of that. I think on the record today they

1    admitted that they do not dispute the relevant facts.

2         So the focus on necessity, this is something that

3    really only comes up in the *Ezell*, the sort of second order of

4    protection, and the state has attempted to sort of inject it

5    into the first order question of whether something is an arm.

6    And I think the reason that they've done this is that they try

7    to consider suppressors in isolation as just sort of the

8    frozen banana metaphor of just a suppressor, but the State's

9    only interest in regulating suppressors is because they can be

10   used in a firearm.  That's the only reason that they would

11   have any sort of regulatory basis for banning them.

12        It also is more consistent with *Bruin,* which talks

13   about conduct, not inanimate objects or items.  It talks about

14   what conduct is protected by the Second Amendment, and the

15   conduct here is possessing a firearm that has a suppressor on

16   it.  That is the relevant conduct.  That's what Plaintiffs

17   want to be able to do legally in this state, and what they can

18   do in 42 other states.

19        And that is also consistent with how we think about

20   other constitutional rights.  A right inures to an individual

21   and not to an object, and so it matters what the individual

22   intends to do.  And so the idea of a suppressor as just sort

23   of an isolated object that can't be used as a weapon belies

24   reality and what Plaintiffs are really seeking to do here and

25   what the State is really seeking to ban here as well, which is

1    firearms outfitted with suppressors.

2          Moving on to some of the precedent.

3          THE COURT:  You are talking about weapons that are

4    outfitted -- somebody mentioned there is one firearm

5    manufacturer who affixes a suppressor silencer to the weapon

6    at the time of shipping, so are we -- you're not limiting

7    yourself to that?  You're limiting it to the universe of all

8    suppressors, all silencers, whether they are born or their

9    genesis is with that silencer or whether it is purchased

10   through some other means and then affixed to the firearm by

11   the firearm owner; is that accurate?

12          MS. LIVAS:  That is exactly right, Your Honor.  There

13   are basically two types.  In one case, they can be integrated

14   into the firearm and so they come in sort of the factory

15   setting already with the suppressor attached.  In other cases,

16   you get it separate and you still affix it.  It is always part

17   of the firearm, but it can either be put on or it just comes

18   automatically, but we believe both are entitled to the exact

19   same constitutional protection.

20          So moving on to -- I want to be clear about the

21   burdens as well because there were some back and forth.

22   Plaintiffs have no burden on this motion.  We have not brought

23   the motion.  We have filed a complaint.  We bear no

24   evidentiary burden.  As to the burden under *Bruin*, it is true

25   that at step one of *Bruin* the Court considers whether the

1   conduct Plaintiffs wish to engage in is covered by the Second

2   Amendment.  I don't know that it is really fair to

3   characterize that as a burden.  It is not like in the

4   employment context when we have to make a prima fascia

5   evidentiary case.  It is a textual inquiry.  It is an

6   interpretive question that the Court can make.  We still have

7   presented extensive legislative evidence about suppressors and

8   why they are necessary to self-defense or important to

9   self-defense, about how they're part of an arm, they're an

10   instrument that constitutes a bearable arm to use Bruin's

11   language, and if anything, we've exceeded our burden, but the

12   really clear burden comes in at step two where the Supreme

13   Court describes it as such.

14          They say the Government must put forth evidence of

15   this historical tradition.  And again, they have just not made

16   that argument.  It is not in the papers.  They made this a

17   step one motion, and so again, there was a concession on that

18   point.

19          THE COURT:  You mentioned an evidentiary record a

20   couple of times, and as you recall that was my first inquiry

21   is where do we go from here because I just don't see it

22   fitting well in a 12(c).  Are you suggesting that the record

23   is already sufficient on these issues?  Where is it?  Where is

24   the testimony, where is the evidence that suggests that these

25   are common use or necessary?

1          MS. LIVAS:  From our perspective, we believe our

2    evidence is sufficient.  So, for example, we've brought forth

3    evidence of how common suppressors are.  There is even new

4    data that just came out on this.  There are --

5          THE COURT:  You are relying on what you filed in this

6    Court?

7          MS. LIVAS:  Yes.  Again, we don't have a burden at

8    this stage, but we believe it is sufficient for a well-pled

9    complaint to show how common they are, to show that they're

10   necessary to self-defense, again, allegations at this stage

11   but because it is legislative evidence it is not unique to the

12   Plaintiffs, something that people would have to testify

13   necessarily.  We think it is something that can sort of be

14   analyzed with the evidence that is available sort of out

15   there.

16         THE COURT:  You used the term suppressor and silencer

17   interchangeably for this case?

18         MS. LIVAS:  We believe silencer is just a misnomer.

19   It implies that there is no sound that comes out.  No such

20   product exists to our knowledge.  Suppressors that are on the

21   market right now usually reduce the decibels from about 160 at

22   the loudest the firearm can be to about 110, which is still

23   the sound of a loud rock concert or an ambulance siren, so it

24   is still pretty loud.  So silencers is just an outdated

25   basically incorrect term.

1          Moving onto the precedent.  So my friend on the other

2     side mentioned *Cox* from the Tenth Circuit.  That is the case

3     that most of the district court cases rely on and many of the

4     cases they cite go back to *Cox*.  That case predated *Bruin* so

5     it really doesn't tell us much.  Where the Supreme Court

6     completely remade the applicable test, *Cox* didn't apply that

7     test so it just doesn't really help us at this stage.  And so

8     yes, there are a handful of cases out there already, but

9     really very few that actually analyze suppressors under the

10    current relevant test.  And of course, nothing binding on this

11    court in this circuit.

12         *Ezell* is binding, yes, but in our favor.  We think it

13    helps us on the alternative argument.  If this Court were to

14    find that a firearm with a suppressor is not an arm,

15    suppressors are still something that makes firearm use safer

16    and more effective.

17         And a contrary position, the position that the State

18    adopts, would create a huge loophole whereby the State could

19    regulate different parts of firearms and make them so unsafe

20    or undesirable to use that no one would want to exercise their

21    right, and they could say, well, it is not a weapon and so

22    we're just regulating all the parts, and that is just not

23    really consistent with the way the Supreme Court has

24    approached the Second Amendment, which is to say there is a

25    broad protection.  The State has to justify its regulations.

1    Just to provide an example --

2         THE COURT:  You dispute that silencers or suppressors

3    are not arms?

4         MS. LIVAS:  We do dispute that.  We believe the right

5    way to think about it --

6         THE COURT:  I asked you the question about whether

7    they exist by themselves, whether they can be considered to be

8    an arm outside of what Mr. Kinkead is talking about thrown as

9    a rock.

10        MS. LIVAS:  Probably not, I suppose.  We just think

11   that is the wrong way to think about it, but if it were

12   just -- if someone didn't want to use it as a firearm

13   suppressor and just wanted to have it --

14        THE COURT:  I was kind of saying what he was

15   addressing, but suppressors by themselves, new out of the box,

16   you consider those to be arms?  Unattached to a firearm, you

17   consider those to be arms?

18        MS. LIVAS:  And the individual didn't want to bear it

19   with the firearm at some point?  They just wanted -- then

20   probably not if there were no -- if there were no connection

21   to the keeping and bearing of an arm.

22        THE COURT:  So it is not a firearm, but it becomes a

23   firearm when it is attached to what we know is traditionally a

24   firearm?

25        MS. LIVAS:  It is about the conduct.  That is what

1    *Bruin* says, at least, what is the relevant conduct, and here

2    the relevant conduct is using it in a firearm because

3    otherwise it would just be sort of bizarre, and the State

4    would have no interest in regulating.  It is just a metal

5    cylinder until it is attached to a firearm and actually used

6    as a suppressor.

7            THE COURT:  Very good.  Anything further?

8            MS. LIVAS:  No.

9            THE COURT:  So you're standing on your record that

10   you supplied, right?

11           MS. LIVAS:  For purposes of this motion, we believe

12   it is sufficient.

13           THE COURT:  Very good.  Mr. Kinkead --  I'm sorry.

14           MR. STAMBOULIEH:  It is okay.

15           THE COURT:  I made that assumption you're both

16   speaking on the same behalf, but go ahead, sir.

17           MR. STAMBOULIEH:  No worries.  I will not take a very

18   long time.  Stephen Stamboulieh for the Morse Plaintiffs.

19           Your Honor, I just have a couple of things to kind of

20   piggyback off of what the Defendants' lawyer had said.  So if

21   we look at whether or not something is necessary, I think

22   anyone that shoots a firearm would say I need to have some

23   kind of protection for my hearing.  Now, I don't know that

24   there are any states that ban ear muffs, but Illinois bans

25   probably the best way to protect your hearing, and that is to

1    have a suppressed firearm, to have a suppressor.  So under

2    Illinois's theory, hearing protection is unnecessary.  That is

3    what I understood them to say.  It is not -- you don't have to

4    have hearing protection to shoot a gun, but I think anyone

5    that shoots a gun would say I need to have bearing protection,

6    right?

7         THE COURT:  They don't have to regulate everything to

8    regulate one thing, right?  There's no requirement that a

9    Government do that.  They can selectively regulate.

10        MR. STAMBOULIEH:  They absolutely can, but if hearing

11   protection going off of what is necessary for the functioning

12   of a firearm or what is necessary to the exercise of the

13   Second Amendment, people would have to have hearing protection

14   or else they are going to go deaf.  So then we get into *Heller*

15   saying that you can ban handguns because you have long guns

16   available, and the Court said that is prosperous.  That is not

17   the word they used, but you can't ban handguns just because

18   long guns are available.  And so what we would say is you

19   can't ban suppressors just because you can put on earmuffs.

20        And we do say in our complaint -- and I agree with

21   what most of what my cocounsel for the other Plaintiffs have

22   said.  We stand on the allegations that we have made in the

23   complaint.  It is a fairly lengthy complaint that makes all of

24   the proper allegations.  I would disagree on one point.  I

25   think a suppressor is a firearm, is an arm, and we know that

1    because just in *VanDerStok*, the case that came out a little

2    bit ago, and it is something that we also included in our

3    complaint, Justice Gorsuch is writing for the majority talking

4    about Justice Thomas' dissent, and it says, "The dissent must

5    acknowledge, for example, that standalone frames or receivers

6    and silencers qualify as firearms," and he is making a

7    statutory distinction there, but we know they are at least

8    firearms because Congress says so in the code.

9         And if we were to just have a suppressor in front of

10   me -- like the Marshals aren't going to let me bring a

11   suppressor in here because it is a firearm.  Even by itself,

12   it is a firearm.  It doesn't matter that it is not physically

13   attached to a firearm, which is, of course, what makes a

14   firearm fun to shoot when you attach it to a firearm and not

15   just to have some, but I think the suppressor just by itself

16   is a firearm because that's what the statutes tell us.

17        And I would also make a couple other points.  *Bruin*

18   also talks about besides what -- all instruments that

19   constitutes bearable arms as being protected by the Second

20   Amendment.  It says, "While the Second Amendment's definition

21   of arms is fixed according to its historical understanding,

22   that general definition covers modern instruments" -- it

23   didn't say modern firearms.  It said modern instruments --

24   that facilitate armed self-defense.  So in our amended

25   complaint, we talk about how our Plaintiffs want to have

1  suppressed firearms to use for self-defense, also for shooting

2  and like range practice, but mostly for self-defense.  So if

3  these modern instruments facilitate armed self-defense, armed

4  meaning they are using their firearms for self-defense, then

5  it says the Second Amendment's definition of arms covers

6  modern instruments that facilitate arms self-defense.  I don't

7  think there's a question about whether or not the Second

8  Amendment protects suppressors.

9       The Defendant filed a notice of supplemental

10  authority on the *US v. Peterson* case in the Fifth Circuit,

11  which immediately after that opinion came out one of the

12  judges on that court withheld the mandate I guess to see if

13  the Fifth Circuit wanted to hear the case with a sua sponte

14  judicial en banc call, like the Ninth Circuit likes to do, and

15  then I believe it's Ms. Livas's firm that has taken over

16  representation of Mr. Peterson and had filed a petition for en

17  banc, which is currently percolating in the Fifth Circuit

18  right now, which would lead to some other result in the Fifth

19  Circuit on whether or not the Second Amendment covers

20  suppressors.

21       And my last point, and I'll be very brief, I do agree

22  with my opposing counsel on one thing when he says we have to

23  look at 1791 when the Second Amendment was ratified, and it is

24  step two that is going to be very important.  What other

25  things that aren't arms that are, in fact, protected?

1   Magazines, it is not a weapon, but it is protected as an arm.

2   Bullets, bullets aren't weapons.  If I just walked in with a

3   handful of bullets, I could throw them at somebody, but it has

4   the same problem as what the Defendant says.  It is not a

5   weapon.  It is something that you use in a weapon.  And a

6   frame of a firearm is not a weapon because it doesn't do

7   anything without having all of the extra parts and pieces that

8   go along with it, but the Supreme Court just held that that

9   was, in fact, a firearm in the *VanDerStok* case.

10          So this test that the Defendants have said, you know,

11  what is strictly necessary for self-defense I think is the

12  wrong test, and if we look at Judge Vandyke's dissent in

13  *Dunkin V. Bonta* from the Ninth Circuit.  He says that the

14  Second Amendment inquiry centers on what the people choose to

15  facilitate armed self-defense.  As we said before, lawful

16  purpose, not necessity is the test.  And that's all I have,

17  Your Honor.  Does the Court have any questions?

18          THE COURT:  You touched on the question of -- and

19  your colleague did as well -- on the question of the interest

20  of the State, and I wanted to -- do you see what the interest

21  of the State is in enforcing this statute?  Do you know what

22  it is without looking at the legislative history?  Just to

23  satisfy curiosity.

24          MR. STAMBOULIEH:  Sure.  I think a lot of these

25  legislators that see something, they get afraid of it and then

1    they move to ban it without having much more --

2            THE COURT:  So public safety maybe?

3            MR. STAMBOULIEH:  It could be public safety, but if

4    that was their interest and obviously the interest of the

5    Government isn't appropriate in a Second Amendment analysis,

6    but let's assume that it is public safety, we have pleadings

7    from the ATF -- we have a white paper from the ATF and our

8    pleadings that talks about suppressors are almost never used

9    in crimes.  So if it was a public safety, these things are so

10   highly regulated from the federal government I don't know that

11   that is a valid interest, but it could be.

12           THE COURT:  I'll let the cat out of the bag in this.

13   It really wasn't whether the use of a suppressor was a public

14   safety concern in and of itself.  It is more that there are,

15   I'm told -- I don't have some personal knowledge of this --

16   I'm told in some high crime areas some reporting capacity of

17   the local city, village, whatever it is, that they can

18   actually triangulate where a firearm is fired within that

19   area.  And I was wondering if that didn't lend itself some to

20   that, wasn't anything clandestine, Mr. Kinkead, that I was

21   trying to get you to say.  I was just wondering whether that

22   was something that was the purpose of why the State of

23   Illinois has taken the position of --

24           MR. STAMBOULIEH:  I think what Your Honor is

25   referring to is ShotSpotter, and that is something that does

1    triangulate where a shot is coming from.  If Mr. Kinkead is

2    right about when the statute was written in 1961, it has

3    nothing to do with ShotSpotter that wasn't invented until more

4    recently.

5            THE COURT:  That makes sense.

6            MR. STAMBOULIEH:  Thank you, Your Honor.

7            THE COURT:  Thank you.  Did I overlook you, ma'am?

8            MS. ASFOUR:  No, Your Honor.  I have nothing to add.

9            THE COURT:  Okay.  Thank you.  I appreciate it.  Mr.

10   Kinkead, response?

11           MR. KINKEAD:  Thank you, Your Honor.  So following up

12   on what you were just talking about, and again, recognizing

13   that I'm not in a position to represent --

14           THE COURT:  I respect that.

15           MR. KINKEAD:  But my understanding is the same as

16   yours, historically, of course, ShotSpotter didn't exist at

17   the time this law was passed, certainly not at the time that

18   the National Firearms Act was passed, which is where a lot of

19   these regulations grew out of, that was during the Great

20   Depression era, but it was perceived, rightly or wrongly, that

21   a firearm with a suppressor or silencer attached you're

22   diminishing the sound that the weapon made when it was fired

23   could cause crime to go undetected.  It is the same concept.

24   Obviously, the technology was different but the same concept.

25           For example, if someone -- and I believe this

1    actually happened, and again, I'm speaking a little bit off

2    the cuff here, but my memory is in the mass shooting that

3    occurred at a municipal building in Virginia Beach in May of

4    2019, there was a mass shooting at a municipal building in

5    Virginia Beach, and a silencer or suppressor was attached to

6    the firearm that the perpetrator used.  Some people in the

7    building in other areas -- again, this is a large building --

8    reported that they did not distinguish the noise that was made

9    by the firearm discharging as a firearm because it was muffled

10   in a way that was unfamiliar to them.  They heard it, but it

11   sounded like something falling on the ground rather than a

12   shot being fire.  Again, that is a little bit off the cuff so

13   I may be getting some of those wrong.

14        THE COURT:  Again, it was to satisfy a curiosity is

15   really my thinking on this, and I probably should have posed

16   the question differently, but that is really what it was.  Was

17   there anything else you wanted to mention in response to their

18   other arguments outside of the subject of my curiosity?

19        MR. KINKEAD:  Yes, absolutely.  So it sort of

20   addresses that point, your Honor, but I think it is important,

21   and it goes to something that Ms. Livas said, and she

22   characterized it as sort of a concession by the State that we

23   had not made a *Bruin* step two argument, and she is completely

24   correct that we have not made a *Bruin* step two argument.  A

25   *Bruin* step two argument would require us to show that there is

 1   a history and tradition of regulating silencers in the way

 2   that we have here, and we haven't done that.  I'm sure she

 3   didn't mean it this way, but in my view it is not a concession

 4   in the sense that we are conceding the point, but rather it is

 5   like, you know, for example, a fraud case where there's five

 6   elements of fraud, and the Defendant moves to dismiss because

 7   one of those elements, let's say reliance, isn't adequately

 8   pleaded.  That is not really a concession on the other points

 9   in the sense that they think that those are necessarily well

10   pleaded.  It is certainly not a concession as a factual matter

11   that any of those can be proven, but you are entitled to focus

12   your emotion only on what you think is the most pertinent

13   issue.  And that is what we've done here.  We think that this

14   can be resolved at step one, whether or not the conduct falls

15   within the plain language of --

16          THE COURT:  I don't disagree with you on that at all.

17   I know what her argument is.  I appreciate it, but didn't take

18   it as a step two issue that we have here today, and I don't

19   see a waiver or anything like that.  So back to the original

20   questions that they brought, whether it is a weapon.

21   Obviously, you say it is not an arm.  It is not a weapon, and

22   you don't believe that it is necessary to the carrying out or

23   the activity involved in exercising Second Amendment rights.

24   Is that it in a nutshell?

25          MR. KINKEAD:  Yeah, I think in a nutshell that is

1    perfect, Your Honor, and I did want to address that point

2    because part of the response and perhaps more implicit than

3    explicit is that we have invented some sort of test and there

4    are some sort of shortcomings in the test that we have

5    invented.  And I want to be clear that this test is certainly

6    not something that we have invented.  In fact, it is something

7    that is supported by Supreme Court precedent, by none other

8    than the author of the *Bruin* decision, Justice Thomas.  And so

9    that is the *Luis vs. United States*.

10         We quoted that in our reply and the Anderson

11   Plaintiffs quoted that in their response.  And again, this is

12   a concurrence from Justice Thomas, but it is one of those

13   cases where there is a plurality decision, I think four

14   justices, and he is the fifth vote, and it is a very

15   complicated analysis which I can't do off the top of my head,

16   but sometimes the plurality opinion in that case is not

17   controlling.  It is the fifth concurrence that is controlling

18   because it is the narrowest.  And again, I'm not making a

19   representation that this is the case here because the actual

20   holding of the *Luis* case is irrelevant.

21         I just want to say, although we are quoting a

22   concurrence, I think it is a I guess I would say supercharged

23   concurrence because it is, in fact, the vote that was

24   necessary to create the holding in that case, which is about

25   the Sixth Amendment, not about our amendment.

1              But this is what Justice Thomas said in that case --

2    and the background of that case is that there was a federal

3    statute that said in essence that the federal government can

4    freeze your assets if it charges you with certain types of

5    financial fraud.  The Defendant in that case said, wait a

6    minute, if you freeze my assets, I can't hire a lawyer to

7    represent me against these very serious charges.  That

8    violates my Sixth Amendment right to counsel.  And the gist of

9    the holding is that, yes, the Sixth Amendment doesn't on its

10   face protect your right to a particular pot of money.  It

11   doesn't say you must have money available to hire a lawyer,

12   but -- it doesn't actually say this, but it is inferred from

13   the Sixth Amendment, you must be able to have a lawyer

14   represent you during a criminal proceeding.  And so the point

15   that Justice Thomas was making in his concurrence is that the

16   acts that are necessary to give rise to the effectuation of

17   the constitutionally protected activity are also protected as

18   a consequence of that, and I think what he said was worth

19   quoting because it is right on point with what we're talking

20   about here today.  So he said, quote, the law has long

21   recognized that the authorization of an act also authorizes a

22   necessary predicate act.  And there he is quoting from Justice

23   Scalia and Brian Garner's book *Reading the Law, the*

24   *Interpretation of Legal Text*.

25              And the particular aspect of that book that he is

1    quoting there is what is called the predicate act cannon,

2    which, again, kind of makes perfect sense.  If an activity is

3    protected the acts that are necessary to engage in that

4    activity are also protected because otherwise it would not

5    amount to anything.  And then he goes on.  I think this is the

6    most important part, Your Honor.  Justice Thomas goes on to

7    say, quote, "Constitutional rights thus implicitly protect

8    those closely related acts necessary to their exercise."  He

9    says, "The right to keep and bear arms, for example, implies a

10   corresponding right to obtain the bullets necessary to use

11   them," and he quotes the *Jackson* case from the Ninth Circuit,

12   and to acquire and maintain proficiency in their use, and he

13   quotes from the *Ezell* case from the Seventh Circuit.

14        That's where we get this necessary language, Your

15   Honor.  It is from Justice Thomas's concurrence in *Luis*.  But

16   that is not the only place that it appears as he explains.  It

17   is a common, well-understood canon of construction,

18   particularly with respect to the Second Amendment.  And I

19   think he is interpreting and reading those cases in the same

20   way that we have, the *Jackson* case and the *Ezell* case.  Again,

21   the test that we propose isn't something that we made up.  It

22   certainly isn't something that we made up for purposes of this

23   motion.  It is well grounded in the Supreme Court case law and

24   in that predicate act cannon which was referenced by Justice

25   Thomas, again, in a book published by Justice Scalia.

1          THE COURT:  I don't think the Plaintiffs are saying

2     you invented that test.  I think that is pretty much

3     understood, right, that that's one of the tests, right,

4     whether it is necessary to the exercise.  I didn't take that.

5     Did I misinterpret your position on that, that, in fact, you

6     are not taking the position that is not the test?

7          MS. LIVAS:  We believe that the State tries to import

8     the necessary test, which is for our sort of second order

9     argument, the *Ezell* type of shooting range and things like

10    that, and they try to import necessary into the first order

11    question whether something is an arm.  And the Supreme Court

12    has never said that something needs to be necessary in order

13    to be a firearm.  In fact, as my friend for the Morse

14    Plaintiff said in *Heller* the Supreme Court rejected that very

15    argument.

16         THE COURT:  I think I see the nuance that you're

17    getting at.  I appreciate you bringing it up.  Thank you,

18    ma'am.  Mr. Kinkead, go ahead.

19         MR. KINKEAD:  A few other things, Your Honor.  I'm

20    sorry to be so long winded here.

21         THE COURT:  That is why we are here.

22         MR. KINKEAD:  So Ms. Livas brought up an example of

23    the State could ban certain components of a firearm or certain

24    parts of a firearm to the extent that it would make the

25    resulting firearm or whatever was available lawfully for use

1    in Illinois I think she said so unsafe or undesirable to use

2    that people would not use it.  They would chose not to use

3    that because we have banned, for example, the sites that are

4    necessary to actually aim it properly and we have said -- I

5    think this is quote from Judge Vandyke in the Ninth Circuit,

6    in his video which he published recently.  Maybe you've

7    watched it, Your Honor.

8            THE COURT:  I've seen it.  I have not watched it all

9    the way through, though.

10           MR. KINKEAD:  It is an interesting video, worth

11   watching.  In essence, he was criticizing the Ninth Circuit's

12   en banc opinion in the *Dunkin* case as effectively meaning that

13   the State could say for every component of a firearm you can

14   only possess the jankiest, was his term, type of component,

15   the least useful, the bare minimum to get by.  And so I

16   understood Ms. Livas to be making a similar type of argument

17   that essentially the State could say, well, none of these

18   particular components are necessary because you could get

19   something worse, and the result would be a firearm that was so

20   unsafe or undesirable that no one would use it.  And my

21   response to that is I think that would infringe on the right

22   to keep and bear arms as I explained earlier.  So if, in fact,

23   the result of the State's regulation was that no one wanted to

24   use the firearms, the only firearms that were available for

25   use in the state, it would be an infringement of the right to

1    keep and bear arms.  It would destroy that right effectively

2    for the people in Illinois.  And that, I think, is -- you can

3    imagine a scenario, I guess, where a state tried that.  It is

4    certainly not what we're seeing today, but I think if that

5    ever were to happen, I think the test that I have proposed

6    would prevent that from being constitutionally abolished.

7         I think that goes for a lot of the sort of counter

8    examples that both Ms. Livas and Mr. Stamboulieh mentioned

9    either here today or in their papers.  A lot of what they said

10   the State could do under our test, in fact, I believe the

11   State could not do under the test because it would amount to

12   infringing on the right to keep and bear arms.  That is the

13   constitutional safeguard, Your Honor.  The State cannot go so

14   far in regulating things that are not arms that it gets to the

15   point where the weapon that results is so unsafe or

16   undesirable that no one uses it.

17        One point that Mr. Stamboulieh raised, and that I

18   want to address, is he spoke about the *VanDerStok* opinion,

19   which the Supreme Court just issued in March.  And I want to

20   be very clear about both that opinion and about an argument

21   that Mr. Stamboulieh raised in his papers.  It is true -- and

22   I can't deny it because it is true -- that Congress in the

23   National Firearms Act define the word firearm to include

24   suppressors or silencers.  They also use the word silencer,

25   but I think we've established that between the three of us

there is no distinction between those terms.  It is true that
Congress has made this choice.  They haven't mentioned this,
so maybe I shouldn't either, but I will.  If you look at our
criminal code of the actual law they are challenging, it is
Section 24-1(a)(6) of our criminal code, and it says, "A
person commits the offense of unlawful possession of weapons
when he knowingly possesses any device or attachment of any
kind designed, used or intended for use in silencing the
report of a firearm."  So if you see what the legislature has
done here, we've essentially defined possessing a silencer as
the crime of unlawfully possessing a weapon.

It is a similar thing, right, Your Honor?  Congress
has said that silencers are firearms, the State of Illinois
has said that they are weapons.  That is not relevant to the
constitutional analysis, you know, and I think it is easy to
see why both as a matter of law and as a matter of
practicalities.

So as a matter of law, Congress -- there is a
specific pathway in our Constitution that explains how you
make amendments of the Constitution, and Chief Justice Marshal
held in 1803 what I think is evident from the Constitution
that Congress cannot bypass that amendment process simply
through an act of ordinary legislation.  So Congress can't
change the meaning of words in the Constitution, nor would we
want them to, right, because, again, those are fixed according

1    to the meaning that people at the time ascribed to them, and a

2    Congress today that changed those meanings without getting the

3    required I think it is three fifths of the states to approve

4    would be bypassing the very protection that our founding

5    fathers put into our Constitution, that a super majority has

6    to amend what is in there.

7            And as for the State of Illinois, you know, I

8    certainly think my friends on the other side would not want

9    the State of Illinois to be able to change the meaning of

10   words in our federal Constitution because what they would do

11   with that, of course, is to say assault weapons are not arms.

12   And if they were dispositive, they would do it, and it cannot

13   be the case that a state which is bound by the Constitution,

14   if it is incorporated against them under the Fourteenth

15   Amendment as it is here, could get out of that simply by

16   passing its own legislation.  Again, that would eviscerate the

17   constitutional right.  So, again, it is true that Congress

18   defined these as firearms and that the State defined them as

19   weapons but it is irrelevant.

20           As you know, Your Honor, and we pointed out in the

21   brief, legislatures do this all the time.  There are so many

22   statutes passed by our congress that describe Puerto Rico as a

23   state, describe the Northern Mariana Islands as a state and

24   just as a shorthand.  They just want to use one word instead

25   of a couple and --

1              THE COURT:  I did not want to impress upon you that I
2     have the belief that legislatures sometimes pass less than
3     thoughtful laws, and I understand your argument in that
4     regard.
5              MR. KINKEAD:  It keeps me in business, though.
6              THE COURT:  A lot of lawyers in business.
7              MR. KINKEAD:  Your Honor, what I want to close with
8     is perhaps what I wish I had said in response to the question
9     you asked earlier, because I was doing a research on an
10    unrelated case and I came across something that I thought was
11    applicable here, and it goes back to the point that Ms. Livas
12    made and that I responded to at the very outset.  There is a
13    step one argument which is whether or not the plain language
14    of the Constitution covers Plaintiffs' desired conduct and
15    there is a step two argument which is whether or not that is
16    consistent with our historical tradition.  Again, the step two
17    argument is not at issue here.
18             Sometimes for the step two arguments, the states try
19    to explain, you know, all the, I guess, policy reasons why
20    they have banned a certain firearm.  And sometimes that is
21    necessary to do in order to explain why the reason it is
22    banned today is consistent with the historical tradition.  But
23    as Mr. Stamboulieh said, it is not an excuse for the courts to
24    engage in sort of policy preferences, right?  And this is the
25    whole point of *Bruin*, a judge cannot say, yes, the Second

1    Amendment covers that, and no, there's no historical tradition

2    of regulating it, but it is really important and therefore I'm

3    going to allow it, right?  That is what courts were doing

4    before *Bruin*.  It is not permissible anymore.  I agree with

5    Mr. Stamboulieh on that point.  But it works the other way as

6    well, Your Honor.  So two days after the *Bruin* decision was

7    handed down the Supreme Court decided *Dobbs vs. Jackson*

8    *Women's Health*, which arguably stands for the other side of

9    the coin.  We cannot read rights into the Constitution that

10   are not there simply because we think they're a good idea.

11   And I think that is fair.

12         Again, the Constitution says what it says.  It means

13   what it means.  We look to 1791, and we don't think about

14   whether or not it is good policy or bad policy or something

15   desirable or something undesirable or even something harmful

16   or not harmful, and that brings me to the Seventh Circuit

17   quote that I mentioned.  This is from a case called *Brown vs.*

18   *Chicago Board of Education*.  The cite is 824 F3d 7134.  The

19   pin cite is 714, and this is from Seventh Circuit case from

20   2016.  And here is what the Seventh Circuit said, "Justice

21   Scalia once said that he wished all federal judges were given

22   a stamp that read stupid but constitutional, as he was

23   implying that not everything that is undesirable, annoying or

24   even harmful amounts to a violation of the law much less a

25   constitutional problem."  And today's case provides another

1    illustration of that fact.

2           For purposes of this motion that we filed, Your

3    Honor, I think that is right on point.  We're not defending

4    the law on the basis of it being sound policy.  I think if we

5    were Mr. Stamboulieh and Ms. Livas would object to that,

6    certainly.  But we aren't doing it because it is a step one

7    argument.  It is a textural argument.  It is about whether or

8    not the 1791 definition of arms and infringe cover this

9    conduct.  And so that is why, Your Honor, we're not talking

10   about the policy reasons today.  We're not talking about

11   whether it is a good law or bad law, and that's also why to

12   the extent that what the Plaintiffs are arguing is that this

13   law makes no sense.  They may be right about that, they may be

14   wrong, but it is just not relevant to the constitutional

15   analysis, Your Honor.  This is a plain language textural

16   application of the principles that the Supreme Court

17   articulated in *Heller*, and we think that they are clear;

18   silencers are not arms and they're not necessary to the use of

19   arms and therefore banning them does not infringe on the right

20   of the people to keep and bear arms.  I'm happy to answer any

21   questions, Your Honor, if you like.

22           THE COURT:  I don't disagree with you.  I think there

23   is plenty of evidence that constitutional rights have been

24   sacrificed at the alter of public safety and other concerns

25   and policies that most people would find unwise and I

1    certainly subscribe to that notion.  My role is not to

2    determine whether this has any wisdom behind it at all.  My

3    personal opinions won't be visible from any order that I

4    write.  It is strictly based upon the learning and teach -- I

5    should say teachings of the Supreme Court and the Seventh

6    Circuit, simple as that.  All right?

7              MR. KINKEAD:  Absolutely, Your Honor.

8              THE COURT:  All right.  Put your concerns away.

9              MR. KINKEAD:  Oh, no.  I certainly didn't mean to

10   imply that I was concerned that you would do that.

11             THE COURT:  I wouldn't be offended either way so no

12   worries at all.

13             MR. KINKEAD:  Thank you, Your Honor.

14             THE COURT:  Anything further in response?

15             MS. LIVAS:  Nothing further.

16             THE COURT:  I got to everybody that wants to have a

17   say so I will -- I want to go back and look at the record

18   materials that I quite frankly just scanned in preparation for

19   this because it is already two inches thick.  I'll do that.

20             Is there a record that you wanted me to look at, Mr.

21   Kinkead, that you've made, the factual record that you've made

22   in some pleading that might not force me to convert it to a

23   rule -- to a summary judgment?

24             MR. KINKEAD:  Yeah, Your Honor.  So first of all, we

25   do not think that it should be converted to a summary judgment

 1   motion.  We're not relying on an evidentiary record because I

 2   think that would necessitate a conversion to summary judgment,

 3   but what we are doing is accepting as true all the allegations

 4   in Plaintiffs' complaint to the extent that there's allegation

 5   -- and I don't know if there's any in particular, but to the

 6   extent they are proper allegations so questions of fact, not

 7   questions of law, but we are accepting all that is true

 8   because we must in order to file a Motion For Judgment on the

 9   Pleadings.  So I would say Plaintiffs' complaints are the

10   place to look for that.

11        THE COURT:  I think I understand.  Anything in

12   response?  We're all good?  All right.  Thank you, everyone.

13        (The hearing was in recess at 11:27 a.m.)

14

15                    REPORTER'S CERTIFICATE

16                 *   *   *   *   *   *   *

17   I, Erikia T. Schuster, RPR, Official Court Reporter for the

18   U.S. District Court, Southern District of Illinois, do hereby

19   certify that I reported with mechanical stenography the

20   proceedings contained in pages 1-63 and that the same is a

21   full, true, correct and complete transcript from the record of

22   proceedings in the above-entitled matter.

23

24   */S/ Erikia T. Schuster*                5-15-2025
     IL CSR, RPR

25