IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LARRY MORSE and THEODORE RAY BUCK, JR., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| | ) Case No. 22-cv-02740-DWD |
| KWAME RAOUL, in his Official Capacity as the Attorney General Of Illinois, et. al. | ) ) ) ) |
| Defendants. | ) ) ) |

| | |
|---|---|
| CARLIN ANDERSON, and DAVE CLARK, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) Case No. 23-cv-0728-DWD |
| | ) |
| KWAME RAOUL, BRENDAN F. KELLY, CRAIG MILLER, and BRYAN ROBBINS, | ) ) ) ) ) |
| Defendants. | ) |

### MEMORANDUM & ORDER

**DUGAN, District Judge:**

This Court is called upon by Plaintiffs to decide whether Illinois' outright ban of firearm "silencers" infringes upon the Second Amendment rights of its citizens. Defendants think not and move to summarily dismiss Plaintiffs' complaints via their

1

Motion for Judgment on the Pleadings. (Doc. 68).  For the reasons explained below, the Court will grant Defendants' motion.

## Background

On December 8, 2022, Larry Morse and Theodore Ray Buck, Jr. filed their Amended Complaint against Kwame Raoul, the Illinois Attorney General, Theodore Hampson, State Attorney for Williamson County, Illinois, and Sean Featherstun, State Attorney for Jefferson County, Illinois, in case number 3:22-cv-2740-DWD.  On February 27, 2023, Plaintiffs Carlin Anderson and Dave Clark filed their Complaint against Defendants Kwame Raoul, the Illinois Attorney General, Brendan F. Kelly, the Illinois State Police Director, Craig Miller, the State's Attorney of Cass County, Illinois, and Bryan Robbins, the State's Attorney of Cumberland County, Illinois, in case number 3:23-cv-0728-DWD. Because of common questions of law, these matters were then consolidated by order of this Court on June 15, 2023. (Doc. 64).

Section 5/24-1(a)(6) of the Illinois Criminal Code,  prohibits the possession of "any device or attachment of any kind designed, used or intended for use in silencing the report of any firearm". 720 ILL. COMP. STAT. ANN. 5/24-1(a)(6). Plaintiffs claim that the statute violates their Second Amendment rights and seek injunctive and declaratory relief, along with fees and costs under 42 U.S.C. § 1988. (Doc. 1).

The Plaintiffs indicate they each wish to acquire a silencer. Plaintiff Buck is a holder of a Federal Firearm License, ("FFL") and would, absent the statute, purchase a suppressor appropriately through the ATF process. He enjoys target shooting but the report of his weapon draws the ire of neighbors who call local law enforcement to

2

investigate. (Doc. 8, p. 16). He also claims that if he were to fire the weapon indoors, such as in a setting requiring his self-defense, his hearing would be damaged. (Doc. 8, p. 17). Plaintiff Morse has already suffered hearing loss due to his service in the United States Army and fears that using his firearm without hearing protection, such as in a situation where need for expediency prevents donning of hearing protection, would worsen his hearing loss. He claims also that, as a firearms instructor, the use of a suppressor would assist him in training his class members. He too, absent Illinois law, would acquire a suppressor through lawful means by applying for ATF's permission. (Doc. 8, p. 17-18).

Plaintiff Dave Clark engages in hunting and participates in long-range rifle competitions and would acquire a suppressor but for its ban in Illinois. Carlin Anderson is the owner of a device prohibited by section 5/24-1(a)(6) but cannot possess it in Illinois, so he keeps it outside of the State. (Doc. 1, p. 12-13).

Defendants Raoul, Kelly, Miller, and Robbins generally respond with the contention that the prohibited devices, which they refer to in their briefing and at argument as "silencers" and "suppressors," are not "arms" in a Second Amendment context, nor are they "necessary to the effective use of" arms. (Doc. 68). As such, they claim that the statute does not offend the Second Amendment. It is on these bases the Defendants move for a judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

<u>Standards Under Rule 12(c)</u>

Federal Rule of Civil Procedure 12(c) provides: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."

3

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is assessed under the same standard as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See, e.g.*, *Mesa Laboratories, Inc. v. Federal Ins. Co.*, 994 F.3d 865, 867 (7th Cir. 2021). Accordingly, Plaintiffs must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In deciding a motion for judgment on the pleadings, the Court must accept all well-pleaded allegations as true and view the alleged facts in the light most favorable to the non-moving party. *Archer v. Chisholm*, 870 F.3d 603, 612 (7th Cir. 2017).

"Judgment on the pleadings is appropriate when there are no disputed issues of material fact and it is clear that the moving party [...] is entitled to judgment as a matter of law." *Unite Here Local 1 v. Hyatt Corp.*, 862 F.3d 588, 595 (7th Cir. 2017). Further, if an affirmative defense "clearly is established in the pleadings […] and no question of fact exists, then a judgment on the pleadings may be appropriate." 5C ARTHUR R. MILLER & A. BENJAMIN SPENCER, FEDERAL PRACTICE AND PROCEDURE § 1368 (3d ed. 2025); *see also Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (affirming the trial court's granting of a Rule 12(c) motion for judgment on the pleadings on the basis of an unpleaded affirmative defense). However, "when material issues of fact are raised by the answer and the defendant seeks judgment on the pleadings on the basis of this matter, his motion cannot be granted." *Id.*; *see also e.g.*, *Crudup v. Barton*, No. 98 C 1498, 2002 WL 276285, at *4 (N.D. Ill. Feb. 27, 2002).

In ruling on a motion for judgment on the pleadings, the Court may consider "the complaint, the answer, and any written instruments attached as exhibits." *Northern Ind.*

4

*Gun & Outdoor Shows, Inc. v. City of South Bend,* 163 F.3d 449, 452 (7th Cir. 1998). "Written instrument" is construed broadly to include such things as affidavits, letters, contracts, and loan documents. *Id.* at 453; *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes."). The Court may also consider "information that is subject to proper judicial notice," along with additional facts set forth Plaintiffs' briefings opposing dismissal, so long as those facts "are consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *see also Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Ind.*, 786 F.3d 510, 528 n.8 (7th Cir. 2015).

Ordinarily, Rule 12(d) requires that a Rule 12(c) motion containing materials outside the pleadings must be converted into a motion for summary judgment. However, the Court may consider documents that are attached to a defendant's Rule 12(c) motion if "they are referred to in the plaintiff's complaint and are central to his claim." *Brownmark*, 682 F.3d at 690.

For the reasons stated below, Defendants are entitled judgment as a matter of law because the Plaintiffs have failed to state a claim that is plausible on its face.

Constitutional Standards

"There is a long tradition of widespread lawful gun ownership by private individuals in this country." *Staples v. United States*, 511 U.S. 600, 610 (1994). That tradition was enshrined at the time of ratification of the Second Amendment: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and

bear Arms, shall not be infringed."[1] The term "arms" was not defined by the drafters of the amendments. But we know that whether a device is included in the category of "arms" is not limited to those weapons in use in the eighteenth century. It is accepted that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)).

> The 18th-century meaning [of "arms"] is no different from the meaning today. The 1773 edition of Samuel Johnson's dictionary defined "arms" as "weapons of offence, or armour of defence." Timothy Cunningham's important 1771 legal dictionary defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."

*Heller*, 554 U.S. at 581 (internal citations omitted).

The dispute here arises from Plaintiffs' initial claim that the prohibited devices are "arms" within the context of the Second Amendment and, accordingly, a citizen using or possessing them deserves the protection of the Second Amendment. Defendants argue that the Plaintiffs are wrong in their interpretation of the Second Amendment, reasoning that the prohibition of such devices does not violate the Constitution because they are not "arms" nor are they necessary to the effective use of arms. (Doc. 68, p. 9-10). The threshold question is one of interpreting the Second Amendment's use of the term "arms."

---

[1] "There are many reasons why the militia was thought to be 'necessary to the security of a free State.' First, of course, it is useful in repelling invasions and suppressing insurrections. [...] Third, when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny." *District of Columbia v. Heller*, 554 U.S. 570, 598 (2008).

6

As a general guide in interpreting this text, "[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning." *Heller*, 554 U.S. at 576 (citing *United States v. Sprague*, 282 U.S. 716, 731 (1931)).

> The Constitution is a written instrument. As such its meaning does not alter. That which it meant when adopted, it means now. Being a grant of powers to a government, its language is general; and, as changes come in social and political life, it embraces in its grasp all new conditions which are within the scope of the powers in terms conferred.

*State of South Carolina v. United States*, 199 U.S. 437, 448 (1905). But this Court remains mindful that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 634–35. As Thomas M. Cooley so insightfully, and maybe prophetically, wrote: "A constitution is not to be made to mean one thing at one time, and another at some subsequent time when the circumstances may have changed as perhaps to make a different rule in the case seem desirable." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 54 (1868). Still, the guidance that both *Heller* and *Bruen* provide lead this Court to the conclusion that the Defendants' Motion for Judgment on the Pleadings should be granted.

## Discussion

Section 5/24-1(a)(6) reads: "(a) A person commits the offense of unlawful use of weapons when he knowingly […] (6) Possesses any device or attachment of any kind

designed, used or intended for use in silencing the report of any firearm." Violation of Section 5/24-1(a)(6) is a felony. The term "silencing" is not defined by the statute. And the parties do not attempt to define or differentiate the terms "suppressor" and "silencer." A suppressor is "a device that attaches to the muzzle of a firearm and makes the firearm quieter when discharged." *Paxton v. Dettelbach*, 105 F.4th 708, 710 (5th Cir. 2024). 18 U.S.C. § 921(a)(25) defines the terms "firearm silencer" and "firearm muffler" mean any device for silencing, muffling, or diminishing the report of a portable firearm." As the Fifth Circuit recently recognized, "[t]hough many use the term 'silencer,' that term 'is a misnomer, in that—despite movie fantasies—a noise suppressor reduces decibels[ ] but does not actually "silence" the discharge of a firearm. Noise may be muffled or diminished, and maybe by only a few decibels at that, but it can still be heard.'" *United States v. Peterson*, No. 24-30043, 2025 WL 2462665, at *2 (5th Cir. 2025) (citing Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 Cumb. L. Rev. 33, 36 (2015)); *see also People v. Alexander*, 613 N.E.2d 385, 387 (Ill. App. Ct. 1993) ("Our interpretation of the section in question is that [section 5/24-1(a)(6)] prohibits silencers, and a silencer does not have to create a complete absence of sound.").

It is not clear that the Framers contemplated the eventual creation of a "silencer" or any device that would serve to reduce the report of a firearm. Originalism would suggest that does not matter. What matters is whether the term "arms," as it was understood by those of colonial times, would have included devices that suppress the volume emitted by a firearm when discharged. Of course, Plaintiffs contend in their pleadings and briefs that silencers are, in fact, "arms" for the purpose of Second

8

Amendment protection. Plaintiffs argue that silencers are things (objects) that citizens carry (activity) for use in and facilitate self-defense because they mitigate some of the negative effects caused by loud gunfire, including hearing loss and noise pollution. (Doc. 75, p. 4). For support of their position, they point to *Bruen*:

> We have already recognized in *Heller* at least one way in which the Second Amendment's historically fixed meaning applies to new circumstances: Its reference to "arms" does not apply "only [to] those arms in existence in the 18th century. Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." Thus, even though the Second Amendment's definition of "arms" is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.

*New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1, 28 (2022) (citing *Heller*, 554 U.S. at 582) (citing *Caetano*, 577 U.S. at 411-12 as an analogous example involving stun guns) (internal citations omitted).

Plaintiffs take a liberal reading of *Bruen*. They emphasize that instruments, like silencers, that "facilitate armed self-defense" are, indeed, "arms." They conclude that silencers are useful in the activity of self-defense and, therefore, users of them are deserving of Second Amendment protection. But this Court believes that Plaintiffs pay too little attention to the Majority's reference to *Heller* and its teaching that the term "arms" has a historically fixed meaning but that modern versions of those weapons may still be included within the universe of "arms." *See Bruen*, 597 U.S. at 27-28.

First, Plaintiffs Morse and Buck briefly mention that the National Firearms Act defines "firearm" to include "silencer" and the Gun Control Act defines "firearm" to be

9

"any firearm muffler or firearm silencer." 26 U.S.C. § 5845(a); 18 U.S.C. § 921(a)(3). Of course, these statutes do not suggest that Congress was adopting the definition of "silencer" to be included in the Constitution's universe of "arms." But what cannot be overlooked is the fact that the federal statutes also regulate the use of silencers. So, Congress' use of those terms does not shed helpful light on whether the Framer's would have classified silencers as "arms."

Plaintiffs indicate that they believe "[t]he term 'arms' encompasses the constituent parts that make an 'arm' function as intended," and include within its definition devices such as suppressors. (Doc. 75, p. 5). Plaintiffs do not point to any binding authority for the proposition that silencers are "arms." They do, however, draw attention to how courts have viewed other weapons, component parts, "accessories," and "accoutrements" related to firearms, as well as the activity of recreational use of firearms in support of their proposition.

Tasers and stun guns are recognized by some to be widely used as a means of non-lethal self-defense citizens in forty-five states. *See Caetano*, 577 U.S. at 420 (Alito, J., concurring). The Eastern District Court of New York found nunchakus,[2] which are in the hands of only 65,000 civilians, to be weapons within the classification of "arms." *Maloney v. Singas*, 351 F. Supp. 3d 222, 237-38 (E.D.N.Y. Dec. 14, 2018).

Users of flash suppressors, for example, have been viewed by at least one district court to warrant Second Amendment protection. *Murphy v. Guerrero*, No. 1:14-CV-00026,

---

[2] Also known as "nunchucks," nunchakus are traditional martial arts weapons consisting of two sticks, usually made of wood, connected by a chain or rope.

2016 WL 5508998, at *26 (D. N. Mar. I. Sept. 28, 2016) (unpublished). Similarly, our District Court found that thirty-round large-capacity magazines constitute "arms" because they can serve "legitimate self-defense purposes." *Barnett v. Raoul*, 756 F.Supp.3d 564, 628 (S.D. Ill. Nov. 8, 2024). And, of course, it has been long held that "arms" are not limited to firearms but include ammunition, bayonets, ramrods and other "proper accoutrements." *U.S. v Miller*, 307 U.S. 174, 180-182 (1939). Plaintiffs reason that suppressors and silencers, as accessories in wide use and as a corollary to the "meaningful exercise of the core right to possess firearms," are "arms" under the Second Amendment. *Wilson v. Cook County*, 937 F. 3d 1028, 1032 (7th Cir. 2019); (Doc. 75, p. 11).

On the other hand, Defendants reason that because "silencers" are not used to cast or strike another, do not contain or feed or project ammunition and do not serve any intrinsic self-defense purpose, they are not deserving of Second Amendment quarter. Unfortunately, there is little helpful guidance that addresses the issues presented by Defendants' Rule 12(c) motion.

Defendants rely on the Tenth Circuit case, *United States v. Cox*, in support of their Rule 12(c) motion. The court in *Cox*, however, dedicated only two paragraphs to its consideration of whether the National Firearms Act's regulation of suppressors violates the Second Amendment. *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018). It paid less than a paragraph to a historical analysis to reach the conclusions that "[a] silencer is a firearm accessory; it's not a weapon in itself," and because silencers are not "bearable arms," they fall outside the Second Amendment's guarantee. *Id.* It is not readily apparent what evidence of a "historically fixed meaning" that the trial court or the Tenth Circuit

11

considered. Simply assigning a new label to a silencer is of little help to the process of determining whether a silencer is an "arm" for Second Amendment purposes. As Plaintiffs alluded to during oral argument, some suppressors are permanently installed by the manufacturer such that the term "accessory" seemingly loses its usefulness.

Defendants also point to a Maryland District Court case which involved a contest of whether the National Firearms Act, 26 U.S.C. § 5801, et. seq, is unconstitutional in its requirements that silencers be registered. *U.S. v Hasson*, Case No.: GJH-19-96, 2019 WL 4573424 (D. Md. Sept. 20, 2019). The District Court found that a silencer is neither an arm nor a weapon in that it "does not serve any intrinsic self-defense purpose" because it, apart from being attached to a firearm, cannot cause harm. *Hasson*, 2016 WL 4573424, at *4. District Judge Hazel did conduct an evidentiary hearing during which he received evidence of the "nature, benefits and purposes of silencers, the application process for registering and serializing silencers, and the prevalence of silencers." *Id.*, at *2. He also received expert testimony on a variety of matters surrounding the use of silencers. *Id.* He seems to have given significant weight to the testimony he received to the effect "you can't hurt anybody with a silencer unless you hit them over the head with it." *Id.* Judge Haley noted that while silencers are useful, they are not "'so critical' to firearm ownership that firearms cannot be used effectively without them." *Id.*, at *5. Respectfully, there is nothing in *Heller* that suggests it is only firearm ownership, and not firearm use, that implicates the Second Amendment. However, in fairness to Judge Haley, he did not have the guidance of *Bruen* at the time he conducted the evidentiary hearing in 2019 and

erroneously applied the "means end scrutiny" analysis. *Id.*, at *4. As far as the reported case reflects, he did not conduct any meaningful historical meaning inquiry.[3]

Defendants do, however, accept as uncontroversial the notions that "the Second Amendment's historically fixed meaning applies to new circumstances: Its reference to 'arms' does not apply 'only to those arms that existed in the 18th century.'" *Bruen*, 597 U.S. at 28 (quoting *Heller*, 554 U.S. at 582). They nevertheless maintain that Plaintiffs make too much of *Bruen's* reference to the scope of the definition of "arms" to include "modern instruments that facilitate armed self-defense." (Doc. 68, p. 9). Defendants prefer a narrow reading of *Bruen*. (Doc. 68, p. 5).

Defendants are joined by some courts that also interpret the Second Amendment's reference to "arms" illiberally to include only those things essential to the firearm's

---

[3] Defendants also cite several cases for the proposition that silencers are not "arms." (Doc. 68, p. 5). However, none engaged in an inquiry into the extent to which silencers facilitate the operation of weapons in self-defense. *United States v. Al-Azhari*, Case No. 8:20-cr-206-T-60AEP, 2020 WL 7334512, at *3 (M.D. Fla. Dec. 14, 2020) (applying the means-end scrutiny test, stating that "the reviewing court considers whether the restricted activity is within the scope of protection of the Second Amendment. If so, the court then applies 'an appropriate form of means-end scrutiny.'"); *United States v. Royce*, Case No. 1:22-cr-130, 2023 WL 2163677, at *4 (D.N.D. Feb. 22, 2023) ("A silencer is not necessary to make a firearm operable. Rather, a silencer is simply a means to reduce sound omitted from a firearm."); *United States v. Saleem*, 659 F.Supp.3d 683, 698 (W.D.N.C. Mar. 2, 2023) ("A firearm is effective as a weapon of self-defense without the use of a silencer, but the reverse is not true; a silencer serves no purpose without a firearm."); *United States v. Villalobos*, Case No. 3:19-cr-00040-DCN, 2023 WL 3044770, at *13 (D.Idaho Apr. 21, 2023) ("Because the [S]econd [A]mendment does not explicitly or implicitly protect Villalobos's right to own a silencer, the Court need not reach the historical inquiry.").

function. The Ninth Circuit reads the Second Amendment so strictly that it concluded that only those components necessary for the function of the weapon receive the Amendment's protection. See *Duncan v. Bonta*, 133 F.4th 852, 867 (9th Cir. 2025) ("By choosing to protect the right to bear 'arms,' not 'arms and accoutrements,' the Founders constrained the scope of the Second Amendment. The term 'Arms' thus encompasses most weapons used in armed self-defense, and the Second Amendment necessarily protects the components *necessary* to operate those weapons. But it does not protect the right to bear accoutrements.")(emphasis added).[4] Thus, in the view of the Ninth Circuit in *Duncan*, no attachment, accessory, or accoutrement, regardless of its increased efficiency, its safety enhancements, or historical availability is protected. *Duncan*, 133 F.4th at 869.

That view is not in keeping with the guidance of *Heller* and *Bruen*. By illustration, while it is true the Second Amendment does not specifically mention a sighting device, it is somewhat imperceptive not to recognize that the Second Amendment loses all meaning if the conclusion is that a sight, despite its obvious efficiency and safety attributes, is not included in the meaning of "arms" because it is not *necessary* to the functioning of the firearm. A First Amendment equivalent of that approach would be to ban modern forms of communication like the internet and social media despite their being more efficient and effective than the means utilized by the eighteenth century town crier or the

---

[4] It is curious whether such a restrictive understanding would survive application during First Amendment considerations such that it would extend the freedom only to the right of the speaker to speak, but not necessarily to speak in a manner to be heard or understood.

14

publisher of *The Pennsylvania Packet and Daily Advertiser*.[5] *Bruen* teaches that even technological improvements to "arms" that enhance means of lawful self-protections, though not envisioned or imagined by the Framers, may still implicate the Second Amendment.

Likewise, it is not enough for Plaintiff to draw only on *Bruen*'s conclusion that the "general definition [of 'arms'] covers modern instruments that facilitate armed self-defense". Such a reading *Bruen* would effectively remove all bounds to the definition of "arms" so long as the device conceivably could be used in self-defense. To reach Plaintiffs' conclusion one must ignore *Bruen's* finding that "the Second Amendment's definition of 'arms' is fixed according to its historical understanding." *Bruen*, 597 U.S. at 28. At the same time, it is not particularly helpful to simply categorize "silencers" as mere "accessories" and pass by any meaningful discussion of what constitutes "arms." *See Cox*, 906 F.3d at 1186 (finding silencers to be mere "accessories").

The difficulty with the Plaintiffs' contention that silencers are "arms" is that, unlike an AR-15 or AK-47 rifle, for example, Plaintiff has not shown that silencers are modern forms of weapons known to be in use or available in the ratification period. The Plaintiffs' Complaints and the record are devoid of any reference to a time in the history of our country where any early generation device, accessory or attachment was broadly employed to reduce the report of a firearm. Put another way, Plaintiffs offer nothing to suggest there is a fixed historical understanding that devices which serve only to enhance

---

[5] Colonial era newspaper famous for printing and circulating to the citizens of the colonies many copies of the then proposed Constitution.

operation of a firearm by reducing its reports are "arms" themselves. Simply, if there was no colonial-era or antebellum-period archetype to a modern-day silencing device, it is difficult to understand how the Framers would have understood the ordinary meaning of the word "arms" to include a device that reduces the report of a firearm.

At the same time, some attachments are so integral to the effective operation of a firearm that they might be logically included within the historically fixed understanding of "arms." For example, and as mentioned earlier, there have been seemingly significant technological advances in firearm aiming technology, from periods where no sighting device was used, progressing to traditional "iron sights" and then evolving to the modern era of sophisticated optical sights which are now apparently widely used because they facilitate more precise aiming. The same can be said about modern magazines that now allow the ammunition to be fed into battery much more quickly and efficiently than each cartridge (or ball, wad and powder) could be inserted by hand.  While some may argue sights or large capacity magazines are just accessories because they are not essential to the "ownership" or "function" of the firearm, such attachments might be considered "arms" because they are modern versions of historically utilized firearm components. One can readily trace the technological advances that have been made over the past several centuries where improvements, modifications, and innovations have been made to or based upon the colonial-era firearms and their accessories and attachments. From the age of the flintlock and wheel lock pistols in the 1700s to the revolver in the 1800s and to the innovation of semi-automatic pistols in the early 1900s, all are the result of improvements and engineering changes made to what some believe was first "pistol"

invented by Caminelleo Vitalli in Italy in 1540. *See generally*, Arcadi Gluckman, *United States Martial Pistols and Revolvers: A Reference and History* (1937). Thus, firearm sights, methods of and devices for "charging" the weapon, and handheld pistols themselves have long historical lineages. But the same cannot be said of silencers. Plaintiffs do not point to a colonial-era or civil war years progenitor of a "silencer" or any device that was employed to reduce report of a firearm; nor has there been, apparently, a period of evolution in silencer technology beginning in the eighteenth, or for that matter, the nineteenth century.[6]

Nevertheless, Plaintiffs argue that silencers, as relatively modern instruments, enhance the efficiency and effectiveness of certain firearms by facilitating armed self-defense in that they improve accuracy, reduce recoil and diminish the report of the weapon used, all of which is particularly useful when the firearm is operated within an enclosed structure, such as a home. (Doc. 75, p. 3-6).[7] The Court accepts those statements as true. Neither does the Court seriously question the truth of the Plaintiffs' allegations that silencers have become popular among law-abiding citizens of other states and are rarely used in carrying out criminal activity. These are all seemingly worthwhile attributes and useful enhancements to the safe operation of a firearm, and, if legislatively

---

[6] Hiram Percy Maxim designed the "Maxim Silencer" in the early 1900s and received his patent in 1909. He made it available to the public in 1912. Wm. Brophy, *Marlin Firearms: A History of the Guns and the Company That Made Them* 654 (1989).

[7] Interestingly, despite expending a fair amount of ink showcasing the usefulness of silencers, the Anderson Plaintiffs admonish this Court that "there is no warrant in the plain text of the [C]onstitution, or in Supreme Court precedent, for this Court to make the call of how useful is useful enough to warrant Second Amendment protections." (Doc. 76, p. 12). This Court agrees that it should not, nor will it, engage in such a "balancing" test or analysis.

approved, might improve the chances that a law-abiding citizen will survive an encounter that requires reciprocal use of deadly force in her own home.

But as useful, and maybe even sound and wise, it is to permit their possession and use, Plaintiffs have not made a plausible claim that silencers are "arms" as that term was understood in the eighteenth century. A silencer, as it is described by Plaintiffs, does not share characteristics or attributes of, or connections to, "arms" in the historical or traditional sense. In other words, they do not plausibly allege the existence of an archetypal device existing in either the eighteenth or nineteenth centuries to demonstrate prior use or understanding by those living in that time, such that the Framers would have thought them to be "arms". And, importantly, Plaintiffs offer no authority to demonstrate that because a device can accompany or be used in conjunction with the basic firearm, it is, whether attached or not, an "arm" for the purposes of the Second Amendment.

## Conclusion

Plaintiffs rely on their Complaints to place before this Court the evidence they claim they need to make their claims plausible for purposes of a Rule 12(c) motions. (Doc. 106, p. 39). The parties agree that there are no factual disputes. (Doc. 106, p. 19). However, as noted, nothing in the pleadings demonstrates the existence of a historical precursor to a silencer that would show prior use or understanding by those living near the time when the Second Amendment was ratified. As a result, Plaintiffs have failed to plead a plausible claim and Defendants are entitled to judgment as a matter of law. Accordingly, Defendants Motion for Judgment on the Pleadings is **GRANTED**.

Judgement is hereby entered in favor of the Defendants and against the Plaintiffs.

Clerk is DIRECTED to close the case.

**SO ORDERED.**

Dated: September 5, 2025

_____
DAVID W. DUGAN
United States District Judge